IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| U.S. *ex rel*. Tullio Emanuele,   )<br>   )<br>   )<br>        Plaintiff/Relator,   )<br>  v.   )<br>   )<br>Medicor Associates, *et al*,   )<br>   )<br>        Defendants.   )<br>   )<br>   ) | C.A. No. 10-245 Erie<br>Chief District Judge McLaughlin |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., Chief Judge

    This matter is before the Court upon Motions to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) filed by Defendants Flagship Cardiac, Vascular, and Thoracic Surgery of Erie ("Flagship") [Dkt 67], Robert J. Ferraro, Charles M. Furr, Richard W. Petrella, Timothy C. Trageser, and Medicor Associates, Inc. ("Medicor") [Dkt. 69], The Hamot Medical Center of the City of Erie ("Hamot") [Dkt. 71], and Donald Zone [Dkt. 73]. This Court has jurisdiction pursuant to 31 U.S.C. § 3729 *et. seq*. and § 3732(a). Responsive briefs have been filed and this matter is ripe for review.

    **I.**    **Background**

    The following factual allegations are derived from Plaintiff's Amended Complaint. From June, 2001 through May, 2005, Plaintiff/Relator Tullio Emanuele ("Plaintiff") was employed as a cardiologist at Medicor, a Pennsylvania corporation engaged in providing cardiology services. [Amended Complaint, ¶¶ 21-23]. Since

approximately 1998, Medicor had been engaged to provide exclusive cardiology services to Hamot, a medical center located in Erie, Pennsylvania. [Amended Complaint, ¶¶ 96-97]. Defendants Petrella, Ferraro, Furr, Trageser, and Zone were each shareholders and/or employees of Medicor engaged in the practice of cardiology. [Amended Complaint, ¶¶ 16-20]. Defendant Flagship provided exclusive vascular and thoracic surgery services to Hamot prior to ceasing operations in July, 2008. [Amended Complaint, ¶ 24].

Plaintiff's claims essentially fall into two categories. First, Plaintiff alleges that Hamot entered into various "sham" contractual arrangements with Medicor and Flagship for the purpose of providing kickbacks to those entities in exchange for patient referrals. With respect to this claim, Plaintiff asserts that, upon being hired by Medicor, he was informed by Furr that Medicor had several "medical directorships" contracts with Hamot and that Plaintiff would be assigned to provide services for Medicor pursuant to one of those contracts. [Amended Complaint, ¶ 98]. Plaintiff was subsequently assigned to provide "medical supervision and direction of rehab/restorative cardiovascular services" pursuant to one such contract. [Amended Complaint, ¶ 99]. Although the contract indicated that "services shall be provided for no fewer than 400 hours per year," Plaintiff states that the contract did not specify or contemplate any particular services or duties and that he was not instructed to maintain any time sheets with respect to the contract. [Amended Complaint, ¶¶ 100-101]. Rather, Plaintiff's actual duties pursuant to the contract required less than 10 hours per month and primarily consisted of a monthly committee meeting. [Amended Complaint, ¶ 102]. Plaintiff was also occasionally asked to sign a time study form prepared by a Medicor administrator which "was often inaccurate," "invariably overstated the amount of time attributed to the services documented," and "did not correspond to duties identified in [Plaintiff's] medical director contract." [Amended Complaint, ¶ 101].

In addition to the directorship under which Plaintiff was assigned, he alleges that Medicor and Hamot entered into several other directorship contracts covering the following services: (1) "Non-Invasive Cardiology, Dr. David Strasser"; (2) Invasive Cardiology, Dr. Timothy Trageser"; (3) "Cardiac Electrophysiology, Dr. James D. Maloney, Dr. Dakas, and Dr. Hayes"; (4) "Cardiac Surgery, Dr. Richard Long"; (5) "Vascular (diagnostics/interventions), Dr. Kish and Dr. George"; (6) "Regional Development/Maintenance, Dr. Richard Petrella and Leo Fitzgibbons." [Amended Complaint, ¶¶ 99, 104]. For each of these contracts, Medicor was paid $75,000 annually. [Amended Complaint, ¶ 104]. Plaintiff avers that each of the directorship contracts was in actuality "intended to disguise the actual purpose which was to provide a vehicle for Hamot to pay kickbacks to Medicor and Flagship CVTS to buy the loyalty of the physicians and insure a steady stream of patient referrals." [Amended Complaint, ¶ 105]. Finally, Plaintiff alleges that "[i]t was understood by Medicor, Flagship and Hamot that Hamot would submit claims for payment to Medicare, Medicaid and other federal health insurance programs for patients referred by Medicor, Flagship and their physicians." [Amended Complaint, ¶ 108]. Consequently, Plaintiff contends that these arrangements violated the Stark Act, 42 U.S.C. § 1395nn(a)(1)(A), and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

Plaintiff's second major allegation is that "[f]rom June 2001, and earlier, and continuing to the present, Medicor and the individual physician Defendants, Petrella, Ferraro, Furr, Trageser, Zone, knowingly, systematically, routinely and repeatedly submitted false claims to, and received reimbursements from, Medicare and other federal health care programs for medically unnecessary cardiac catheterizations and cardiac and vascular surgical procedures, including, but not limited to, Percutaneous Coronary Interventions (PCI)." [Amended Complaint, ¶ 129]. Plaintiff similarly alleges that the Defendants submitted false claims for these medically unnecessary procedures to Medicare and other federal health programs. [Amended Complaint, ¶ 131]. Plaintiff

3

asserts that the scheme to perform unnecessary cardiac procedures was developed by Medicor CEO and Hamot Administrative Director Gary Maras in conjunction with Defendants Petrella, Ferraro, Furr, Trageser and Zone in an effort to rapidly develop a competitive cardiovascular surgery center at Hamot. [Amended Complaint, ¶ 133]. In furtherance of this scheme, Medicor allegedly allowed non-cardiologist physicians to directly schedule patients for catheterization procedures without consulting a cardiologist and implemented a policy of serving as an "admitting physician" for referring physicians who did not have admitting priviliges at Hamot. [Amended Complaint, ¶¶ 134-135]. Medicor physicians also allegedly overstated the severity of certain cardiac conditions on a regular basis and refused to employ more sophisticated technologies to rule out the need for surgical intervention. [Amended Complaint, ¶ 136-137]. Plaintiff contends that this resulted in an inflated rate of surgical intervention following catheterization for Defendants Petrella, Trageser and Ferraro as compared to other members of the practice. [Amended Complaint, ¶ 139]. Finally, Plaintiff cites eight specific examples of surgical procedures or catherizations which occurred between September 12, 2003 and December 16, 2004 that he contends were medically unnecessary. [Amended Complaint, ¶¶ 141-148]. These procedures were performed by Defendants Trageser, Ferraro, Zone and Petrella. [Amended Complaint, ¶¶ 141-148].

Based on the foregoing allegations, Plaintiff filed a Complaint under seal on October 8, 2010, asserting four counts pursuant to the False Claims Act, 31 U.S.C. § 3729 and 3732(a). [Dkt. 1]. A copy of the Complaint was served upon the government and, on September 7, 2011, the government elected not to intervene. [Dkt. 10]. Plaintiff subsequently opted to proceed with the action on his own.

On or about April 5, 2012, each of the Defendants filed a motion to dismiss Plaintiff's original complaint for failure to state a claim. Defendants primarily argued that Plaintiff's claims were barred by the applicable statute of limitations and that Plaintiff

had failed to plead the elements of his claims with the requisite degree of specificity. An oral hearing on Defendants' motions was held on November 8, 2012, at which this Court ruled that all of Plaintiff's claims based on conduct which occurred prior to October 8, 2004 were time-barred and that Plaintiff's remaining claims failed to satisfy the specificity requirements of Federal Rule of Civil Procedure 9(b). However, the Court granted Plaintiff an opportunity to attempt to cure the deficiencies in his complaint with respect to his non-time-barred allegations.

Plaintiff filed his Amended Complaint on November 30, 2012. Thereafter, each of the Defendants renewed their motions to dismiss, once more asserting that Plaintiff has failed to plead his claims with sufficient particularity. Each of these motions is ripe for review.

## II. Standard of Review

Rule 8(a) of the Federal Rules of Civil Procedure states that a pleading must set forth a claim for relief which contains a short and plain statement of the claim showing that the pleader is entitled to relief. A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) must be viewed in the light most favorable to the plaintiff and all the well-pleaded allegations of the complaint must be accepted as true. Erickson v. Pardus, 551 U.S. 89, 93-94 (2007); Neitzke v. Williams, 490 U.S. 319 (1989); Estelle v. Gamble, 429 U.S. 97 (1976). The issue is not whether the plaintiff will prevail at the end but only whether he should be entitled to offer evidence to support his claim. Neitzke; Scheuer v. Rhodes, 419 U.S. 232 (1974). As the United States Supreme Court recently held in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), a complaint must be dismissed pursuant to Rule 12 (b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." Id. at 570 (rejecting the traditional 12 (b)(6) standard set forth in Conley v. Gibson, 355 U.S. 41 (1957)). The court must accept as true all allegations of the complaint and all reasonable factual

inferences must be viewed in the light most favorable to plaintiff. Angelastro v. Prudential-Bache Securities, Inc., 764 F.2d 939, 944 (3rd Cir. 1985). The Court, however, need not accept inferences drawn by plaintiff if they are unsupported by the facts as set forth in the complaint. See California Pub. Employee Ret. Sys. v. The Chubb Corp., 394 F.3d 126, 143 (3rd Cir. 2004) (citing Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3rd Cir. 1997)). Nor must the court accept legal conclusions set forth as factual allegations. Twombly, 550 U.S. at 555 (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. Although the United States Supreme Court does "not require heightened fact pleading of specifics, [the Court does require] enough facts to state a claim to relief that is plausible on its face." Id. at 570.

Similarly, Rule 9(b) prevents a plaintiff who cannot "specifically plead the minimum elements of his allegation" from gaining access to "learn the complaint's bare essentials through discovery." United States ex. rel. Joshi v. St. Luke's Hospital, 441 F.3d 552, 556 (8th Cir. 2006). Rule 9(b) further provides that the circumstances of "all averments of fraud or mistake . . . shall be stated with particularity."

### III. Discussion

#### A. WSLA Tolling

Prior to considering the sufficiency of Plaintiff's Amended Complaint, a preliminary legal issue, raised by Plaintiff in a document styled a "Supplemental Opposition to the Defendants' Motion to Dismiss," warrants discussion. As recounted above, this Court had previously ruled that each of Plaintiff's claims based upon conduct which occurred prior to October 8, 2004, are barred by the statute of limitations set forth in 31 U.S.C. § 3731(b)(2). In his Supplemental Opposition, Plaintiff requests reconsideration of that order on the basis of the Wartime Suspension of Limitations Act

("WSLA"), 18 U.S.C. § 3287, which, prior to amendment in 2008, provided in pertinent part:

> When the United States is at war the running of any statute of limitations applicable to any offense (1) involving fraud or attempted fraud against the United States . . . shall be suspended until three years after the termination of hostilities as proclaimed by the President or by a concurrent resolution of Congress.

18 U.S.C. § 3287 (2006) (current version at 18 U.S.C. § 3287 (2011)). Plaintiff contends that, "[i]f the WSLA applies to this case, the statute of limitations extends back to October 11, 2002, the date on which hostilities with Iraq began, rather than to October 8, 2004." (Plaintiff's Supplemental Opposition, Dkt. 84, p. 2). In seeking application of the WSLA tolling provisions, Plaintiff directs this Court to the Fourth Circuit's recent decision in U.S. ex re. Carter v. Haliburton Co., 710 F.3d 171 (4th Cir. 2013).

In Carter, an employee of a private company providing logistical support to the United States military in Iraq filed a *qui tam* FCA action alleging that his employer had falsely billed the United States for unperformed water purifying operations. Carter, 710 F.3d at 174-75. When the defendants challenged the timeliness of his complaint, Carter responded that the tolling provisions of the WSLA extended the time period in which to file his action based upon the United States military action in Iraq. Id. at 178. Defendants countered that the WSLA applied only to formally declared wars, rather than to informally authorized military actions, and that it did not apply to privately instituted FCA actions where the United States government was not a party. After the district court dismissed the action as time-barred, the relator appealed.

In a divided decision, the Fourth Circuit reversed, holding that the statute of limitations for Carter's private FCA claim had been tolled by virtue of the United States military conflict in Iraq. The Fourth Circuit held that "the Act does not require a formal declaration of war" because "had Congress intended the phrase 'at war' to encompass only declared wars, it could have written the limitation of 'declared war' into the Act . . ." Carter, 710 F.3d at 178. The Court supported its holding by noting that "requiring a declared war would be an unduly formalistic approach that ignores the realities of today, where the United States engages in massive military campaigns resulting in enormous expense and widespread bloodshed without declaring a formal war." Id. Consequently, the Court concluded that the United States military action in Iraq, authorized by Congress on October 11, 2002 but never formally "declared," nonetheless satisfied the "at war" requirement of the Act. Id. at 178-79.

With respect to the second critical question, the Court found again in favor of the relator, determining that "relator-initiated claims are [not] excluded from the ambit of the WSLA." Id. at 181. The government had urged the Court to draw guidance from its previous decision in United States ex rel. Sanders v. North American Bus Industries Inc., 546 F.3d 288 (4th Cir. 2008), wherein it had held that the tolling provisions set forth in Section 3731(b)(2) of the False Claims Act were only available to the United States (and not to private relators) because the statutory text refers only to the government, contains no mention of private parties, and because tolling the statute for private relators would create "a strong financial incentive" for relators to "allow false claims to build up over time before they filed, thereby increasing their own potential recovery." Sanders, 546 F.3d at 295. Despite the parallels between the WSLA and Section

3731(b)(2) of the FCA, the Carter majority distinguished Sanders by opining that "whether the suit is brought by the United States or a relator is irrelevant . . . because the suspension of limitations in the WSLA depends upon whether the country is at war and not who brings the case." Id. at 180.

In a well-reasoned dissent, Circuit Judge Agee disagreed, noting first that "no case has ever held (other than in dicta) that the WSLA applies to civil cases where the United States is not a plaintiff or intervenor in the *qui tam* action." Id. at 189 (Agee, J., dissenting). In the absence of controlling caselaw, Judge Agee analyzed the statutory text and found no support for the majority's conclusion that the WLSA applied to private relator actions pursuant to the FCA:

> At first blush, Carter is correct that the WSLA applies to "any offense," involving fraud against the United States (obviously, when certain conditions are met). But to read "any offense" as encompassing actions by private relators is a superficial reading of the WSLA and fails to construe the statute in context. By the terms of the WSLA, the government is solely entitled to invoke and terminate the tolling provisions of [] that statute, however, the text of the WSLA is entirely silent as to private relators. The triggering and terminating provisions of the WSLA are both related to and solely controlled [by] actions of the United States government: declaration of war or congressional authorization for use of military force (to trigger) and congressional resolution or Presidential proclamation (to terminate). In either circumstance, Congress and the President possess the unique power to invoke the WSLA to toll the limitations period for fraud offenses: a period when the same government is thus released from a looming time bar to bring an FCA claim. The private *qui tam* plaintiff has no connection with these decisions and it seems odd to conclude that such a private plaintiff, absent a clear statutory direction, should be entitled to the same limitations period as the necessary actor, the government. There is no such clear statutory direction. . . . Thus the text of the WSLA, on its own, supports the proposition that only the United States may take advantage of its tolling provisions.

Id. at 191 (Agee, J., dissenting).

9

Turning to the legislative history and purpose behind the statute, the dissent next noted that "the primary concern motivating Congress in passing the WSLA was the ability of law enforcement to effectively police fraud against the government during the fog of war." Id. at 192 (Agee, J., dissenting); see also United States v. Smith, 342 U.S. 225, 228-29 (1952) ("The fear was that law-enforcement officers would be so preoccupied with prosecution of the war effort that the crimes of fraud perpetrated against the United States would be forgotten until it was too late."). The legislative history underlying the WSLA similarly reflects this concern:

> During normal times the present 3–year statute of limitations may afford the Department of Justice sufficient time to investigate, discover, and gather evidence to prosecute frauds against the Government. The United States, however, is engaged in a gigantic war program. Huge sums of money are being expended for materials and equipment in order to carry on the war successfully. Although steps have been taken to prevent and to prosecute frauds against the Government, it is recognized that in the varied dealings opportunities will no doubt be presented for unscrupulous persons to defraud the Government or some agency. These frauds may be difficult to discover as is often true of this type of offense and many of them may not come to light for some time to come. The law-enforcement branch of the Government is also busily engaged in its many duties, including the enforcement of the espionage, sabotage, and other laws.

Id. at 193 (Agee, J., dissenting) (quoting Bridges v. United States, 346 U.S. at 217 n. 18 (1953) (quoting S.Rep. No. 1544, 77th Cong.2d Sess. (1942)). The recent 2008 amendments to the WSLA are in accord:

> The legislative history of the Wartime Enforcement of Fraud Act of 2008 ("WEFA"), Pub. L. No. 110-417 § 855, which contained the most recent amendments to the WSLA, reveals that the same concerns motivated Congress in passing the 2008 amendments to the WSLA. In sending the WEFA to the full Senate, the Judiciary Committee report repeatedly emphasized the difficulty of investigators, auditors, and the Department of Justice in ferreting

10

>out fraud against the United States during the conflicts in Iraq and Afghanistan. See S.Rep. No. 110-431.

Id. In contrast, neither the WSLA nor its legislative history contains any reference to actions to prevent fraud brought by private relators. As noted by Judge Agee, "[t]he complete silence as to relators in the legislative history of the WSLA is all the more telling when one considers that the FCA, which was originally passed in 1863, was on the books when the Congress considered the WSLA in 1942 and the WEFA in 2008." Id. (quoting Palisades Collections LLC v. Shorts, 552 F.3d 327, 334 n. 4 (4th Cir. 2008), for the proposition that, when faced with statutory silence, "we presume that Congress is aware of the legal context in which it is legislating.").

Finally, Judge Agee addressed the policies underlying the FCA and concluded that they also would "be directly thwarted by allowing private relators to take advantage of the WSLA's tolling provisions." Id. For example, he noted that "differing incentive structures . . . motivate relators, as opposed to law enforcement, in the context of FCA actions." Id. at 194 (Agee, J., dissenting). Whereas relators have "a strong financial incentive" to "allow false claims to build up over time" in order to increase their potential recovery, the government "always has an incentive to quickly act to root out fraud against the United States." Id. The purpose of the FCA – "to combat fraud quickly and efficiently by encouraging relators to bring actions that the government cannot or will not – is severely undermined when the *qui tam* relator "could wait a decade or more to bring a *qui tam* claim, secure in the knowledge that law enforcement is otherwise too occupied with the exigencies of war to discover the fraud on its own." Id.

Neither the submissions by the parties nor the Court's own research has produced any other case specifically addressing the narrow issue as to whether the

11

tolling provisions of the WSLA are applicable to FCA actions instituted by private parties in which the United States declines to intervene. However, after careful consideration of both the majority and dissenting opinions in Carter, we conclude that the legislative history and Congressional intent behind both the WSLA and the FCA caution against application of the WSLA's tolling provisions to private FCA claims. Moreover, this holding is consistent with our previous conclusion that the tolling provision set forth in Section 3731(b)(2) of the FCA, the text and purpose of which is also focused entirely upon the government, does not apply in cases where the United States is not a party. Indeed, the dissent in Carter noted this precise parallel:

> Simply reading "any offense" to encompass all offenses regardless of whether the United States is the plaintiff, is inconsistent with the nuanced approach that courts have employed when reading the "civil action" language in § 3731(b). We reasoned in Sanders that "a civil action" should not be read to encompass all FCA actions, but rather, should be read in context to include only those actions brought by the United States. Sanders, 546 F.3d at 294-95. Here, the WSLA (like § 3731(b)(2)) mentions the United States, not private relators. Thus the text of the WSLA, on its own, supports the proposition that only the United States may take advantage of its tolling provisions.

Id. at 191 (Agee, J., dissenting). In light of the foregoing, we hold that Plaintiff's allegations concerning conduct which occurred prior to October 8, 2004 remain time-barred.

### B. Motions to Dismiss

As previously noted, Rule 9(b) requires that, "in all averments of fraud or mistake, the circumstances constituting fraud shall be stated with particularity." Courts have held that this requirement does not obligate a plaintiff to plead the "date, place or time" of

each specific allegation of fraud "so long as they use an 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" Rolo v. City Investing Co., 155 F.3d 644, 658 (3rd Cir. 1998) (quoting Seville Industrial Machinery v. Southmost Machinery, 742 F.2d 786, 791 (3rd Cir. 1984)). In dismissing Plaintiff's claims as set forth in his original Complaint, we found that Plaintiff had failed to satisfy this pleading requirement:

> [P]laintiff's allegations in the instant case are conclusory and nonspecific. For example, with respect to illegal self-referrals, Plaintiff alleges only that Hamot entered into several medical directorship contracts with Medicore and Flagship that were "sham arrangements designed to disguise the actual purpose of Hamot to pay kickbacks to Medicor and Flagship in exchange for patient referrals." (Complaint ¶ 101). He further states that these arrangements resulted in the referral of "a substantial number of patients to Hamot." (Complaint ¶ 103). Plaintiff, however, fails to allege any details or facts supporting the conclusory allegation that the directorship contracts were in fact "shams." For example, the complaint does not delineate why the medical directorships at issue were not legitimate service contracts, what instructions concerning the service contracts were allegedly given, and whether any specific or even general number of referrals allegedly took place pursuant to the contracts.

[Oral Hearing Transcript, 11/16/2012, Dkt. 63, pp. 58-59]. To illustrate the factual shortcomings of Plaintiff's Complaint, we highlighted the more detailed allegations set forth in two similar complaints filed in this district in Singh v. Bradford Regional Medical Center, 2006 WL 2642518 (W.D. Pa. 2006), and Bartlett v. Quorum Health Resources, C.A. No. 3:04-57 (W.D. Pa). In Singh, the relator had alleged that Defendants had engaged in a scheme to induce and disguises kickbacks and self-referrals by utilizing a sham equipment sub-lease, bolstering his accusations with specific details concerning the cost of the equipment, the absence of any need for the equipment or utilization thereof, and the particular details of the payment scheme. Id. In Bartlett, the relator

13

had provided details concerning a scheme in which the defendant's allegedly billed the government for unnecessary tests, charged inflated prices, gave and received unnecessary referrals, and received improper kickbacks for those referrals. Id.

In the instant motions to dismiss, Defendants again contend that Plaintiff's Amended Complaint falls well short of the level of factual specificity required by Rule 9(b). With the exception of Plaintiff's allegations against Defendants Flagship and Zone, discussed *infra*, we disagree. Plaintiff's Amended Complaint has supplied many of the precise details identified by this Court as absent from his original complaint. For example, Plaintiff explains that the medical directorship contracts were "shams" because they required little to no actual work, did not specify any particular duties or obligations, and grossly overcompensated Medicor and the individual defendants for their purported services. Plaintiff asserts that he was asked to sign off on time records that were pre-prepared by an administrator at Medicor and bore no relation to any actual work performed in order to give the directorship contracts the appearance of propriety. Plaintiff asserts that these sham contracts and illegal referrals were coordinated by Gary Maras, an executive holding positions at both Hamot and Medicor, in conjunction with, *inter alia*, Defendants Furr, Trageser and Petrella, each of whom allegedly held a paid directorship. Finally, Plaintiff alleges that, as the result of his own work pursuant to one of the Medicor directorship contracts, he observed numerous improper self-referrals and illegal submissions for payments from federal programs such as Medicare and Medicaid first-hand.

Plaintiff has also supplied additional facts concerning his medical necessity claims. For example, Plaintiff alleges that the Medicor cardiologists who held

directorship posts had rates of surgical intervention which greatly exceeded those of other Medicor cardiologists and provides a handful of examples of specific patients who underwent allegedly unnecessary procedures. [Amended Complaint, ¶¶ 141-144]. Plaintiff also avers that Medicor physicians intentionally overstated and misrepresented the severity of stenosis on angiogram films in order to increase surgical intervention by deliberately employing a medically unacceptable standard for blockages and by intentionally refusing to utilize best-available technology to confirm diagnosis and rule out the need for surgery. [Amended Complaint, ¶¶ 136-137].

In light of the foregoing, the Court finds that Plaintiff has injected sufficient detail into his allegations to rise "above the speculative level" with respect to Defendants Hamot, Medicor, Petrella, Ferraro, Furr, and Trageser. See Twombly, 550 U.S. at 555; see also United States v. Kensington Hospital, 760 F.Supp. 1120, 1125 (E.D. Pa. 1991) ("Rule 9(b) was not intended to require a plaintiff to know every detail before he or she could plead fraud."); United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 20 F.Supp.2d 1017, 1049 (S.D. Tex. 1998) ("The basic framework, procedures, the nature of fraudulent scheme, and the financial arrangements and inducements among the parties and physicians that give rise to Relator's belief that fraud has occurred have been alleged with specificity; Plaintiffs are entitled to discovery before being required to list every false claim, its dates, the individuals responsible, and why each patient was not eligible for Medicare.").

With respect to Defendants Flagship and Zone, however, the Court finds that Plaintiff has failed to plead with sufficient detail to support his claims. Although Plaintiff generally avers that Flagship was "closely affiliated" with Hamot and Medicor as the

"exclusive provider of vascular and thoracic surgery services of Hamot," Plaintiff has failed to plead any facts suggesting that Flagship took part in fraudulent practices. Plaintiff does not allege that he ever worked for Flagstaff or acquired any familiarity with Flagship's practices, nor has he identified any sham directorship contracts, patient referrals, false claims, or any other improper acts or practices attributable to Flagship. Rather, Plaintiff's attempt to state a claim against Flagship is based entirely on allegations against Medicor and Hamot.  Similarly, Plaintiff does not allege that Dr. Zone was a party to a fraudulent medical directorship contract or provided services pursuant to such a contract, and the lone accusation concerning an unnecessary procedure allegedly performed by Dr. Zone is clearly barred by the applicable statute of limitations. [Amended Complaint, ¶ 145] (alleging that an unnecessary cardiac catheterization was performed on September 12, 2003).  Consequently, Flagship and Zone's motions to dismiss are granted with prejudice.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| U.S. *ex rel*. Tullio Emanuele, )<br>)<br>)<br>Plaintiff/Relator, )<br>v. )<br>)<br>Medicor Associates, *et al*, )<br>)<br>Defendants. )<br>)<br>) | C.A. No. 10-245 Erie<br>Chief District Judge McLaughlin |

## **ORDER**

AND NOW, this 26th day of July, 2013, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Motions to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) filed by Defendants Flagship [Dkt 67] and Zone [Dkt. 73] are GRANTED with prejudice. Defendants Flagship and Zone are dismissed from this action.

The Motions to Dismiss filed by Defendants Ferraro, Furr, Petrella, Trageser, Medicor, and Hamot [Dkts. 69 and 71] are each denied.

/s/ Sean J. McLaughlin
United States Chief District Judge

cm: All parties of record. ___