1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3      TULLIO EMANUELE,
                      Plaintiff
 4        vs.
                                       Civil Action No.
 5      MEDICOR ASSOCIATES, INC., et    10-245
        al.,
 6                      Defendant.

 7
                            - - -
 8

 9        Transcript of proceedings on November 6, 2017
        United States District Court, Pittsburgh, PA,
10      before Judge Joy Flowers Conti.

11
        APPEARANCES:
12
          For the Relators:      Morgan Verkamp
13                               Frederick M. Morgan, Jr., Esquire
                                 Chandra Napora, Esquire
14                               Sonya A. Rao, Esquire
                                 Jennifer M. Verkamp, Esquire
15                               35 East Seventh Street
                                 Suite 600
16                               Cincinnati, Ohio 45202

17                               Simpson Law Firm
                                 Gregory M. Simpson, Esquire
18                               165 North Main Street
                                 Jonesboro, Georgia 30236
19
                                 Stone Law Firm
20                               Andrew M. Stone, Esquire
                                 437 Grant Street
21                               1806 Frick Building
                                 Pittsburgh, Pennsylvania 15219
22

23        For the Defendants:    The Stallings Law Firm
                                 Stephen S. Stallings, Esquire
24                               The Osterling Building
                                 228 Isabella Street
25                               Pittsburgh, Pennsylvania 15212
```

```
 1
 2      For the Defendants:      Burns White LLC
                                 David B. White Esquire
                                 Laura E. Benson, Esquire
 3                               48 26th Street
                                 Burns White Center
 4                               Pittsburgh, Pennsylvania 15222

 5                               Knox, McLaughlin, Gornall & Sennett
                                 Neal R. Devlin, Esquire
 6                               120 West Tenth Street
                                 Erie, Pennsylvania 16501
 7
        For the United          U.S. Attorney's Office
 8      States:                 Colin J. Callahan, Esquire
                                 700 Grant Street
 9                               Suite 400
                                 Pittsburgh, Pennsylvania 1521915212
10
        Court Reporter:         Barbara Metz Leo, RPR, CRR
11                               700 Grant Street
                                 Suite 6260
12                               Pittsburgh, Pennsylvania 15219

13

14

15

16

17          Proceedings recorded by mechanical stenography;
        transcript produced by computer-aided transcription.
18

19

20

21

22

23

24

25
```

1          THE COURT:  Please be seated.  This is a pretrial

2     conference in United States of America ex rel. Tullio

3     Emanuele, M.D. versus Medicor Associates, Inc. and Hamot

4     Hospital, civil action No. 10-245.

5          Will counsel please enter your appearance?

6          MS. NAPORA:  Chandra Napora for the relator.

7          MS. VERKAMP:  Jennifer Verkamp for the relator.

8          MR. MORGAN:  Frederick Morgan for the relator.

9          MR. STONE:  Andrew Stone for the relator.

10         MR. SIMPSON:  Mark Simpson for the relator.

11         MS. RAO:  Good afternoon, Your Honor.  Sonya Rao for

12    the relator.

13         MR. STALLINGS:  Stephen Stallings for defendant UPMC

14    Hamot.

15         MS. BENSON:  Laura Benson for UPMC Hamot.

16         MR. WHITE:  David White for UPMC Hamot.

17         MR. DEVLIN:  Neal Devlin for Medicor.

18         MR. MUSONE:  Michael Musone for Medicor.

19         THE COURT:  First thing we're going to do is go over

20    the voir dire and the preliminary charge which I had sent to

21    you last week, so let's look at the voir dire first.

22         Is there any comments on the first page?

23         MS. NAPORA:  No, Your Honor.

24         THE COURT:  Second page?

25         MS. NAPORA:  No, Your Honor.

 1          THE COURT:  If I don't hear anything, I'm going to

 2   assume nothing negative.

 3          We have all the names of the lawyers correct?

 4          MS. NAPORA:  Now that you mention, my name is not

 5   there.

 6          THE COURT:  Can you spell that again?

 7          MS. NAPORA:  C-h-a-n-d-r-a.

 8          THE COURT:  Where should you fall?

 9          MS. NAPORA:  Let's put me at the end.  And then

10   N-a-p-o-r-a.

11          THE COURT:  Do it again.

12          MS. NAPORA:  C-h-a-n-d-r-a.  Last name is

13   N-a-p-o-r-a.

14          THE COURT:  Fourth page?

15          MR. DEVLIN:  Yes, Your Honor.  Just a couple of

16   issues.  If we can add Michael Musone after my name on behalf

17   of Medicor.

18          THE COURT:  Okay.

19          MR. DEVLIN:  In No. 5, Your Honor, Theresa Kisiel,

20   her name is four from the bottom first column, is actually

21   spelled K-i-s-i-e-l.

22          THE COURT:  Okay.

23          MR. DEVLIN:  I may have just missed this.  I'm not

24   sure who Ian Doig is.  Middle of the first column.

25          MS. NAPORA:  Your Honor, he's our summary witness.

1            MR. DEVLIN:  I missed that.

2            THE COURT:  Do we have any names for any of these

3     custodians?  Otherwise, I can't give that.  They wouldn't

4     being be given or referred to.

5            MS. NAPORA:  We do not have names.

6            MR. DEVLIN:  We do not either yet.

7            THE COURT:  Mr. Stallings?

8            MR. STALLINGS:  No, Your Honor.

9            THE COURT:  Any other names that should be on here

10    that are not on here?

11           MS. NAPORA:  No, Your Honor.

12           MR. DEVLIN:  None from us, Your Honor.

13           THE COURT:  How about page 5?

14           MR. DEVLIN:  No, Your Honor.

15           THE COURT:  Six?  Seven?  Eight?  Nine?

16           MR. DEVLIN:  Here, Your Honor, I do have one.  I

17    questioned whether it may be possible to add a single

18    voir dire question as to whether any members of the venire had

19    ever treated with UPMC Hamot or Medicor.

20           THE COURT:  Well, I think we asked the question if

21    they have some negative --

22           MR. DEVLIN:  It's the next question.  20 asks whether

23    they had any especially positive or negative experiences with

24    Hamot.

25           THE COURT:  We can add Medicor.

1          MR. DEVLIN:  There's another one that asks about

2    Medicor after that, and then another one that asks about UPMC.

3          THE COURT:  Wouldn't that cover anybody that's

4    treated there?

5          MR. DEVLIN:  Not necessarily, Your Honor.  They could

6    have negative experiences.  Hamot is very active in the

7    community.  They could have had negative or positive

8    experiences with Hamot with a number of items.

9          I'm not asking any follow-up about what their

10   treatment was, but if a person had treated at Hamot, for

11   instance, and then they answered the next question that they

12   had an especially positive or negative, that would be

13   information that would be helpful to me.

14         THE COURT:  I'm telling you the only kind of

15   experiences they could have had with Medicor or the Medicor

16   physicians are generally with treatment?

17         MR. DEVLIN:  I would be perfectly fine limiting that

18   to simply Hamot on the treatment question.

19         THE COURT:  I'm sorry.  You don't want Hamot to know

20   if somebody has a positive or negative experience with Hamot

21   except for their treatment?

22         MR. DEVLIN:  No, Your Honor.  I'm not asking to

23   strike question 20.  I'm asking to add a question as to

24   whether they've treated.  For instance, if a potential juror

25   indicated --

1          THE COURT:  I understand that almost everybody in

2     that area probably has been to a Hamot facility at some time,

3     so you would be asking everybody in the jury panel.  The most

4     important question is whether they have something positive or

5     negative about their experience.

6          MR. DEVLIN:  Understood, Your Honor.  A lot of people

7     use Vincent, so it's about a 50/50 split in the city.  If I

8     knew they had treated and they had a particularly negative

9     experience, that --

10          THE COURT:  That would be followed up with.  If they

11    said yes, we go into what are they, you know, then they'll

12    have to tell us.  Well, my doctor blotched a surgery or they

13    want to say positive, great experience, wonderful recovery.

14    We'll find that out in the follow-up.

15          MR. DEVLIN:  Understood, Your Honor.

16          THE COURT:  Page 10?  Page 11?  Page 12?  Page 13?

17    And then the rest is pretty standard.  And we are going to

18    select ten jurors just because of the length of the trial.

19          They will all sit at the end if they're still all

20    there.  If they drop out, they drop out.  We'll proceed with

21    the remaining unless we get below six.  Okay?

22          MS. NAPORA:  Thank you, Your Honor.

23          THE COURT:  This is going to be ten.  I'm going to

24    pick ten.  It says eight here.  We're going to do ten.  Then

25    it would be so forth and so on.  Juror 17 would be juror No.

1   9, and 18 would be juror No. 10.  Okay.  So you'll each have

2   four strikes.  Anything else for the voir dire?

3          MS. NAPORA:  No, Your Honor.

4          MR. DEVLIN:  No, Your Honor.

5          MR. WHITE:  May I just ask for clarification?  You

6   said four strikes for each party.  That means Medicor has

7   four?

8          THE COURT:  No.  Collectively the defendants have

9   four.  You have to agree.

10          MR. WHITE:  Okay.  May we ask the court to consider

11  having four --

12          THE COURT:  No.  Thank you.  Preliminary charge.

13          I'm not going to have eight strikes on each side

14  because it has to be evened out.  That would be too many

15  strikes, so the interests are aligned between the two

16  defendants.  So for that reason, there's no problem with

17  combining the four.

18          MR. WHITE:  Can we compromise at six each?

19          THE COURT:  No.  We're going to be here all day and

20  the next day.  This isn't that complicated in terms of the

21  issues that could rise to the level of good cause.

22          MR. WHITE:  Fair enough.

23          MS. NAPORA:  So let me just ask a clarifying

24  question.  When you say "good cause," the strikes you're

25  talking about peremptory strikes, but we could make additional

1    challenges for cause?

2            THE COURT:  Yes, yes.  I mean, those are where the

3    real issues are going to come.  The rest of it is just your

4    strategies in terms of working things out.

5            I called at least 35 jurors to come in so we should

6    have enough to select from.

7            You know, depending on -- I can't tell how many for

8    cause challenges there could be.  So the preliminary charge,

9    anything on page 1?

10           MS. NAPORA:  No, Your Honor.

11           THE COURT:  Page 2?

12           MR. STALLINGS:  Just one point, judge.  Nothing

13   substantive.  There's a line in here which indicates that

14   there will be an adjournment on Fridays at 2:00, but I think

15   we understood from your pretrial order, you were not going to

16   be trying on Fridays.

17           THE COURT:  On some Fridays.  What I intend to do on

18   Wednesday is hand out to the jurors the schedules for November

19   and December.  That would show the days that we are not going

20   to be there and if there's some earlier adjournments.

21           For example, on November 15, we'll be adjourning

22   early because there's a 150th celebration for the Erie

23   division court, and we're going to have a reception there for

24   the courthouse and the community.

25           MR. STALLINGS:  Might I indulge?  I think on all

1    sides' behalf, if you could share that schedule with us

2    because we have been working to get the doctors and everybody

3    slated and slotted.

4            THE COURT:  You'll have it Wednesday morning.

5            MR. STALLINGS:  Thank you, Your Honor.

6            THE COURT:  At least by Wednesday morning.

7            MS. NAPORA:  Your Honor, may I just, on this page,

8    this says court will be in session today as well as Wednesday

9    and Thursday, and I thought we were starting on Wednesday.  I

10   wasn't sure if that was a typo.

11           THE COURT:  Right, right.  As well as Thursday of

12   this week.  Friday is a federal holiday, so that's why we're

13   not in session.  Then we're going to hand out the schedules

14   for everyone.  Anything else on that page?

15           Page 3?  Page 4?  Page 5?

16           MS. NAPORA:  Your Honor, just another typo.  The very

17   last line, it says prove her case.

18           THE COURT:  Prove his case.

19           MS. NAPORA:  Thank you.

20           THE COURT:  Page 6?  Page 7?  Page 8?  Page 9?  Page

21   10?  Page 11?  Page 12?  Page 13?  Page 14?

22           MS. NAPORA:  Your Honor, we have some comments on

23   page 14.

24           THE COURT:  Okay.

25           MS. NAPORA:  The first enumerated line there where it

1    says, "Defendants knowingly caused to be presented or

2    submitted," it might be clearer to the jurors if it simply

3    mimicked the statute, so "Defendants knowingly submitted or

4    caused to be submitted."

5            And then sort of mirroring that in this case with

6    respect to the second element, "Dr. Emanuele alleges that

7    claims submitted or caused to be submitted to Medicare for

8    payment by Hamot and Medicor."

9            THE COURT:  Okay.

10           MS. NAPORA:  Sort of an ancillary piece is the

11   definition of knowingly.  We're concerned as it's currently

12   presented to the jury that they're not going to know going in

13   that knowingly encompasses more than just actual knowledge

14   and that it includes reckless disregard and willful --

15   deliberate indifference.

16           So I don't know -- I can certainly propose a line to

17   add in there if Your Honor would be amenable to that.

18           THE COURT:  Mr. Stallings?  She wants a definition of

19   knowingly that's set forth in the False Claims Act.  I think

20   there's a statutory definition for it.

21           MR. STALLINGS:  Well, I think she's asked for three

22   things.  On item 1, there's a rewording to track the language

23   of the statute.  We wouldn't have any objection to that.

24           Line 2, I didn't understand because, as it reads, I

25   think now it just says the claim was false or fraudulent.  I

1    think that also tracks the statute.  I don't think that --

2            THE COURT:  She is not changing that.  She wants to

3    say the term knowingly is defined in the False Claims Act as,

4    and track the statutory language.

5            MR. STALLINGS:  Obviously, we haven't seen that, and

6    it hasn't been proposed to us.  We'll obviously consider

7    whatever they propose and give you our comments.

8            THE COURT:  I'll add it for right now.  I'll track

9    the language, and you'll see it when it comes out.

10           MR. STALLINGS:  Just so we're clear, the argument I

11   heard didn't have to do with the statutory language.

12           THE COURT:  That's in the statute.

13           MR. STALLINGS:  That's a separate instruction that

14   has its own complicated set of issues associated with it.

15           THE COURT:  But it is the statutory language.

16           MR. STALLINGS:  I think we would like to see and have

17   an opportunity to look at the language.

18           THE COURT:  I'll get it out to you for tomorrow.

19   Basically what I intend to do is say the term knowingly is

20   defined in the False Claims Act as and just track the

21   statutory language.

22           MS. NAPORA:  Thank you, Your Honor.

23           THE COURT:  And then we'll flush it all out at the

24   time of the final charge.  Anything else on page 14?

25           MS. NAPORA:  No, thank you.

1          THE COURT:  Page 15?

2          MS. NAPORA:  We just have a couple of things.  On the

3     first full paragraph, the Anti-Kickback Statute generally

4     prohibits, third line down, "to induce another person to

5     recommend or refer."  The guidance clearly encompasses

6     recommend and refer.  I'm sorry.  The statute.

7          Down a little bit "to prove a violation of the

8     Anti-Kickback statute document must prove that Hamot knowingly

9     and willfully offered or provided payments.

10          THE COURT:  What would it be?

11          MS. NAPORA:  It would include offered or provided

12     payments, the statute includes.

13          THE COURT:  The word offer?

14          MS. NAPORA:  Yes.  In return for Medicor referring --

15     it said Medicaid, but it should be Medicare patients.

16          And then the only other thing is the very last line

17     is Stark Law and Anti-Kickback Statute also contains.  Just

18     get rid of that.

19          THE COURT:  Okay.  Anything else from defendants?

20          MR. STALLINGS:  We don't agree with those changes.  I

21     would like to see those and compare them to the statute.

22          THE COURT:  You may do that.  You'll get one more

23     go-around with this.  Page 16?

24          MS. NAPORA:  A slight change.  If a financial

25     relationship or we would suggest or arrangement simply

1    because, while the Stark law speaks --

2              THE COURT:  Which line are you looking at?

3              MS. NAPORA:  The very first line.  It says -- midway,

4    it says if a financial relationship satisfies all the --

5              THE COURT:  Or arrangement?

6              MS. NAPORA:  Arrangement, because that's a concept

7    inherent in Stark law and the Anti-Kickback Statute.

8              THE COURT:  Arrangement.

9              MS. NAPORA:  Then the second line down, when it says:

10   "That relationship does not," you could just add "That

11   relationship or arrangement does not violate."

12             THE COURT:  I'll put those things in.  Same change in

13   the next paragraph referring to relationships.  Okay?

14             MS. NAPORA:  Thank you, Your Honor.

15             THE COURT:  Anything else?  16?  Page 17?  Page 18?

16   Page 19?  Page 20?  Page 21?  Page 22?

17             So we'll get those out.  We'll do a redraft and get

18   those circulated.

19             MR. STALLINGS:  Just for the record, judge, we

20   reserve our objections as made in the motions in limine.

21             THE COURT:  That's clear for everyone.

22             MR. STALLINGS:  Thank you, Your Honor.

23             THE COURT:  Now, we're going to go to -- there's some

24   other motions that were just filed.  Let's deal with those.

25             There's the relator's motion to exclude witnesses,

1  and there were 11 witnesses that were recently added, and they

2  include Tim Grode, Theresa Kisiel, Valerie Jackson, Theresa

3  Anderson, Quentin Orlando, Patrick Bannon, Paul Demjanenko,

4  Robert Maholic, Jean Moubarak, Rochelle Krowinski and Paul

5  Hanna.

6        Essentially the plaintiff is arguing that those

7  witnesses were not identified in Rule 26 disclosures.  The

8  defendants argue that they were otherwise made known and the

9  otherwise made known has come through discovery, and some of

10 them were also identified in the relator's own disclosures.

11       Several courts and treatises held that witnesses

12 adequately identified during discovery are excluded from Rule

13 26 obligations, a supplement in re Jacoby Airline Crash

14 Litigation 99-6073 2007 Westlaw 559801 at *8 through 10,

15 District of New Jersey, February 14, 2007 which denied in part

16 plaintiff's motion to exclude witnesses that were not formally

17 identified pursuant to Rule 26 because their identity was

18 otherwise made known during the discovery either in

19 depositions or in responses to discovery requests, and volume

20 8A of Charles A. Wright Federal Practice and Procedure section

21 2049.1 states there is no need as a matter of form to submit a

22 supplemental disclosure to include information already

23 revealed by witnesses in a deposition or otherwise through

24 formal discovery.

25       The court in Mikulan versus Allegheny County, No.

1    15-007, 2017 Westlaw 2374430 at *10 Western District PA, May

2    31, 2017, the court addressed a similar issue.  The defendant

3    in that case sought to prevent a plaintiff from calling a

4    witness because that person was not identified in initial

5    disclosures or answers to discovery requests.

6            The court noted that the plaintiff had been

7    questioned about this witness during the plaintiff's

8    deposition, and there was notice from that that the plaintiff

9    would know that this became known during the deposition.

10           So now, at this stage, you know, the question that

11   the court has is a way to determine whether or not these

12   people have otherwise been made known, and that would require

13   going through each one of these 11 people to see what the

14   depth of the information would have been for this, and at this

15   stage, the court is going to require, in order to be able to

16   resolve this, the court is going to require a written proffer

17   from the defendants about each of these witnesses, what their

18   testimony will be.

19           That needs to be provided no later than Wednesday,

20   and if there's going to be a renewed objection -- I'm going to

21   deny this without prejudice, and if there's going to be a

22   renewed objection to those individuals, you need to be

23   specific as to whether or not they were identified during the

24   discovery, and if there's not going to be any further

25   objection, then on Friday of this week, each of those people

1    will be made available for deposition if they are within the

2    control of the defendants.

3           I don't know if they are still continuing employees

4    of any of the defendants.  To the extent they are, they will

5    need to be made available on Friday for depositions, and the

6    depositions can last no more than one hour.  So you have to be

7    direct and precise with what you are going to be asking.

8           To the extent of the written proffers, the

9    depositions would be limited to the information set forth in

10   the proffer and those individuals will not be permitted to

11   testify outside of the proffer.  So you just have to be

12   careful about what they're going to be testifying about.

13          I think that's the only way to cure this problem at

14   the present time, because I think part of the purpose behind

15   having Rule 26 is not just to testify that there were people

16   who may generally know things, but if you are going to be

17   relying on a particular witness to prove your claim or

18   defense, you know, the other party knows that that's someone

19   that needs to be deposed, and if they fail to do so, that's on

20   them.

21          At this stage, we'll at least know if they're going

22   to be testifying about something that's relevant to the case,

23   not relevant.  You know, at this stage, I think that's the

24   best way to go, and I don't think your proffers need to go

25   beyond two pages, unless there's going to be very detailed

1   testimony.

2          You should expect a written proffer on Wednesday for

3   any of those witnesses you intend to call during the trial,

4   and if you want to depose any of those people, you can do so

5   on Friday, and if there's a need to renew a motion to exclude

6   those witnesses, I'll entertain that next week.

7          MR. WHITE:  Judge, may I respond to that, if I may?

8          THE COURT:  Sure.

9          MR. WHITE:  Judge, as we went through methodically in

10  our response, these witnesses are no surprise to anyone.

11  They're listed in several discovery responses.  They were

12  mentioned in several depositions.  Every one of these

13  witnesses' names have been known for over two years, so for

14  the relators to come in now and suggest they're surprised, I

15  would say is disingenuous at best.

16         THE COURT:  The problem I have in this case is there

17  were a lot of claims that were there initially and they're not

18  there now.  We're going to see this in spades when we get to

19  these exhibits, because it appears the defendants are seeking

20  to litigate the claims that have been dismissed from this case

21  or withdrawn from this case, I think is the better way to

22  state it.

23         So I mean, I don't know what these witnesses are

24  going to be testifying to.  If they're testifying to something

25  that's not related to the instant claims, then there's a

19

1    question of relevancy.

2         MR. WHITE:  Well, judge, we will abide by your

3    request to provide a proffer, but at this -- I don't want to

4    say early stage, but at this stage of the game, to provide a

5    proffer and have depositions on Friday, it puts us a little

6    bit behind the eight ball.

7         THE COURT:  Everybody is behind the eight ball, but

8    that's the way it's going to be.

9         MR. MORGAN:  Your Honor, I know I'm --

10        THE COURT:  If you want to take them, you take them.

11   If you don't, you don't, but you got to communicate as soon as

12   possible to the other side if you are going to be taking them

13   so you can get them lined up.  I think I limited them to an

14   hour each.  It's not going to be extensive, and it can only

15   targeted at what's in the proffer.

16        MR. MORGAN:  Can we agree to a different day for part

17   of them if it's agreeable, or do you want them all on Friday?

18        THE COURT:  You can agree to different dates, if you

19   like.  I'm trying to expedite this for everyone, but if you

20   feel there's another date that would be better that doesn't

21   interfere with the trial, you can do that.

22        MR. WHITE:  Some of these are going to be a challenge

23   because we have been trying to schedule them with their

24   schedules to come in to testify at trial, so see if their

25   availability is for Friday might be a challenge.

1          THE COURT:  You can work that out with the other

2     side.

3          MR. WHITE:  Thank you, Your Honor.

4          THE COURT:  So that takes care of those.  So if this

5     process is complied with, then they will be able to testify,

6     so it's denied without prejudice at this time.

7          Now, there's a motion to exclude Ross Swanson from

8     testifying.  I thought this was already resolved.  I don't

9     know how anybody can be prepared to, if at the time the

10    Daubert hearings were held, and that wasn't all that long ago,

11    there was only going to be one person testifying to that

12    report.  Otherwise, there should have been two reports.

13         MR. DEVLIN:  Your Honor, I could speak to that, if I

14    may, Your Honor.  Would you prefer me to come up to the

15    podium?

16         THE COURT:  State your name for the court reporter.

17         MR. DEVLIN:  Neal Devlin on behalf of Medicor.  Your

18    Honor, very briefly, there was one report with two signatories

19    on it.  This is not a situation where there is an expert.

20         THE COURT:  You don't know whose was whose.  That was

21    the problem when we went through that.  We don't know who was

22    testifying to what?  Whose opinion was what?  They both signed

23    it, so it was both of their opinions.

24         And then so we said at the end, okay, one person

25    should testify, and that was going to be -- you chose the

1  person you were going to have testify.

2      MR. DEVLIN:  Your Honor, certainly at the end of the

3  day, Ms. Hartman can testify as to all of those issues.  The

4  relators did not depose either of them.  We offered both for a

5  deposition.

6      If the relators had been interested as to who was

7  doing what within that report, that was completely available

8  to them before the Daubert hearing.  The reason we listed both

9  was, as Your Honor has identified, this case has evolved since

10 that point, for instance, with the withdrawal of the sham

11 allegations that we learned about the last time we were here.

12     Ms. Hartman's focus, while both of them have

13 expertise in both areas, her focus is on the financial and

14 institutional industry standards with regard to these

15 relationships, whereas, Mr. Swanson is more boots on the

16 ground.  Here's what you do in these directorships, and here's

17 what we do industrywide and how what we did compares to that.

18     THE COURT:  Why is that latter even relevant here?

19     MR. DEVLIN:  Your Honor, they're claiming that the

20 relationships at issue -- I believe their Anti-Kickback claim

21 is one of the reasons for these relationships was to induce

22 referrals.

23     We plan on proving that 100 percent of the reasons

24 for these relationships was for medical care for patients, so

25 talking -- medical care and structuring of a heart hospital,

1    so talking about what we did to create that heart hospital is,

2    for our purposes, the alpha and omega as to what these

3    relationships were for, having nothing to do with referrals.

4         With all due respect, Your Honor, we believe that is

5    a core of our defense to tell the jury this is what these

6    things were for.  It's not about referrals.  It's about making

7    a top 50 heart hospital.

8         So that is why from both a financial perspective to

9    explain, yes, this was normal, this is what places in

10   Pittsburgh and places throughout the nation were doing, and

11   then these people were doing actual real work that had actual

12   real results.

13        THE COURT:  You would rather have him than her?

14        MR. DEVLIN:  If I'm forced to choose, I would rather

15   have her, understanding she could then testify as to the work

16   he contributed to it, like any other expert.

17        I'm certainly not going to go back on what we

18   indicated in the Daubert in the sense of if there's only one,

19   it's Ms. Hartman.

20        THE COURT:  Do you intend to challenge her about her

21   ability to proffer the opinions that the defendants are saying

22   really came from Mr. Swanson?

23        MS. NAPORA:  No, Your Honor, we don't.  I mean, from

24   our view, it's one or the other, and they both signed the

25   report.  Either one of them could speak to the report.

1          THE COURT:  I think we'll leave it with her.  I mean,

2     if they try to challenge her on any basis that she doesn't

3     have a background or something, I'll revisit this, because I'm

4     not going to prejudice you in that way, but she authored it,

5     she signed it, you have one report, and that will be it unless

6     the other side opens the door.

7          MR. DEVLIN:  Understood, Your Honor.  Thank you.

8          THE COURT:  That one will be granted.  Now, I think

9     those were the only non-witness motions left; is that correct?

10          MS. NAPORA:  I think there's only one open motion

11     left which is our motion to amend our pretrial statement.

12          THE COURT:  That's where you wanted to --

13          MS. NAPORA:  Well, we -- the issue of duplicate

14     claims had come up.

15          THE COURT:  The duplicate claims.  You wanted to

16     amend for that.  You also wanted to add exhibits?

17          MS. NAPORA:  Right.  We added a couple of exhibits to

18     our exhibit list and that was the bulk.

19          THE COURT:  I wasn't quite sure about the exhibits.

20     I understood the duplicate, but I don't know why you needed

21     those other exhibits.

22          MS. NAPORA:  Well, I think as we prepare for trial,

23     and as we got closer to the date, we identified other issues

24     we would like to bring forward, and because of the court's

25     rule that everything that -- they were limited to what we

1    present in the pretrial statement, we wanted to make sure we

2    had our belts and suspenders.

3        THE COURT:  Well, I don't see a problem with just

4    eliminating the duplicate damages.  I think that's consistent

5    with the argument that we had at our prior hearing, that there

6    were problems with the duplications and they've been removed

7    now.  Both sides have full access to all that information.

8        I think it does help to streamline this, so that will

9    be permitted, but I'm just not sure about these exhibits.  I

10    don't have enough information about them to know why, and at

11    this stage, I think you need to do more than just say what you

12    want.

13        I'm going to talk about the defendants' other

14    objections but this is different.  These are new ones that are

15    just coming up at the last minute.

16        MS. NAPORA:  Your Honor, I appreciate that, but I

17    think if the measurement is prejudice, some of these are in

18    their discovery responses.  They know them.  They said them.

19        THE COURT:  You are on the eve of trial.  There's a

20    difference here in approach, at least from my point of view.

21    You know, you have had plenty of time to -- years to get these

22    exhibits together, and the time for presenting the exhibits to

23    the court was at least two weeks ago, and the parties would

24    have had an opportunity to meet and confer, and now the last

25    days before the trial, you want to add these new exhibits.

1           So I think we have a higher burden at this stage to

2     show good cause as to why these should be here, which means

3     you would have to show why it's nonprejudicial.  So let's talk

4     about those.

5           R304, Gold analysis and interpretation.  Who did this

6     come from?  What is it?

7           MS. NAPORA:  I'm sorry.  We're having some technical

8     difficulties.

9           THE COURT:  I'm going to note the defendant has a

10    general objection to anything after May 31, 2005 which was the

11    relator's last day of employment should not be included.  I'm

12    going to overrule that objection, and the defendants have

13    their objections preserved.

14          MR. STALLINGS:  Judge, just to clarify where we are.

15    You've moved beyond the motion to amend and we're talking

16    about the objections in general, or are we still on the motion

17    to amend?

18          THE COURT:  We're still on the motion to amend to

19    include these objections.

20          MR. STALLINGS:  I apologize.  Thank you.

21          THE COURT:  This is a motion to amend the exhibits

22    list, as I understand it.  I want to deal with that first

23    before we get to the general objections to the exhibits.

24          MS. NAPORA:  We're discussing whether we can

25    streamline this by removing 304 and 305.

1          THE COURT:  So those are gone?  306?  It's from 2001.
2    Predates everything.
3          MR. MORGAN:  May I speak to this, Your Honor?
4          THE COURT:  Yes.
5          MR. MORGAN:  The defense has made a constant focus at
6    least in the liminal motions hearing as well as speaking this
7    afternoon to how important their rankings, their reputations,
8    their top 100 awards are.  This is a two page document from
9    Hamot's documents which address health grades standards and
10   what Hamot's health grades actually were.
11         So I would say that it's their own document.  There's
12   no surprise, and it's directly relevant to something which
13   they said in the liminal motion hearing was critically
14   important to their defense.
15         So as far as good cause shown frankly, judge, we had
16   not seen it and had not anticipated fully how central to the
17   defense this issue ostensibly is going to be, so I would
18   respectfully ask given that it is their document that we be
19   allowed to proffer it.
20         MR. STALLINGS:  Judge, again, this is a brand new
21   exhibit, but --
22         THE COURT:  Is Dr. McClellan going to testify?
23         MS. NAPORA:  Unfortunately, Dr. McClellan is
24   deceased.
25         MR. STALLINGS:  It's also a marketing letter to

27

1    Dr. McClellan from 2001.  We get these all the time, judge.

2    This is one of these here's where you rank.  Do you want to

3    use our service?  It's literally a marketing letter.

4              THE COURT:  From a third party.

5              MR. STALLINGS:  Not from Hamot.  To McClellan at

6    Hamot from a third party named Nora Sugintas Andrews who is

7    the vice president of Health Care Partnerships.

8              This begs a question that I think should guide all of

9    us as we go through these exhibits today and these specific

10   objections, which are going to be a problem.

11             THE COURT:  Some of them are not going to be a

12   problem because none of your objections are going to be

13   sustained.  They're all going to be rejected.  You failed to

14   comply with my court order.  You did not provide a brief.

15             I have no context in which to view any of the

16   exhibits to which you were objecting, so in my mind, this

17   borders on vexatious litigation.  It is wasteful of the

18   court's time.  108 pages of an objection to over 700 exhibits,

19   I think if my math is correct.

20             So this is something that I have never seen in any

21   case that I have had before me.  I have no way to study each

22   of those exhibits to try to fathom in my mind what would be

23   your objections.  They are all boilerplate.  It's repeated and

24   repeated and repeated.

25             And you know, to the extent there may be a handful in

1   there that would be more discernible, they are lost in the sea

2   of the objections, and to expect the court to go through each

3   one of those with the same kind of boilerplate analysis.  You

4   say it's not relevant, you give no understanding to the court

5   about why it's not relevant.  You say it lacks authenticity

6   when we know a lot of them came from your own files.

7          So when we get into this, I am going to tell you, you

8   know, you do this again, I will be open to a motion for

9   sanctions.  This is not permissible.  This is not the way you

10  practice in this court, and that's just the way that it's

11  going to be.

12         You cannot expect a court to go through 108 pages of

13  your objections where you don't have the courtesy to file a

14  brief.  You don't have the courtesy to group some of the

15  objections, to tell the court how you intend to -- why you

16  feel you are justified, so even if there may be a handful of

17  meritorious objections in there, I can't find them.

18         MR. STALLINGS:  Judge, I can address all of those

19  points if you would like now.

20         THE COURT:  I'm telling you right now this is

21  discourteous to the court to have an approach and a

22  presentation like that, and it's not permitted.

23         MR. STALLINGS:  I can explain to the court exactly

24  what that represents and why in many ways it entailed harder

25  work, more effort and more effort exhibit by exhibit.

1      THE COURT:  It didn't come across to me.  You are

2  requiring more work and more effort for this court without any

3  explanation or ability for the court to do what I need to do,

4  so the same courtesy you showed in preparing that, then the

5  court is going to rule and it is going to be on that.

6      MR. STALLINGS:  May I be heard?

7      THE COURT:  What do you have to say?

8      MR. STALLINGS:  I'd like to say it, judge.  May I?

9      THE COURT:  Okay.

10      MR. STALLINGS:  Let's begin with the process, because

11  we did go through painstakingly each and every one of the

12  relator's exhibits, and for each one, we articulated

13  separately in a box related to that specific exhibit --

14      THE COURT:  They looked all the same to me.  Very

15  similar.

16      MR. STALLINGS:  They're not.  I can explain as to

17  each one why we chose the language we chose and why we chose

18  to brief it in the box the way we did.  Each one only

19  addresses the objections that would apply to that specific

20  exhibit.  So in many ways --

21      THE COURT:  I have one that said every one is not

22  authentic, not relevant, not this, on and on.  We can go.

23  Let's go through.  You want to go through and we'll point out

24  those.  Every one is virtually the same.

25      MR. STALLINGS:  There are overlapping objections that

1    apply to a great many of the exhibits, and part of this, I

2    mean, in a very serious and substantial way, relates to what

3    you addressed earlier, judge.

4            THE COURT:  Did you meet and confer about these at

5    all?

6            MR. STALLINGS:  We did, but you have to understand

7    how these came down from a time perspective.  When their

8    exhibits came to us for the first time, despite us having

9    asked months in advance for them and for the jury instructions

10   and receiving them at the very last minute when they were

11   called for by the court order, and we had a very aggressive

12   court order to provide all of these objections, so we had to

13   go through each and every exhibit, review them internally with

14   our team, and for each exhibit, we did this, judge.

15           We didn't do it in categories.  We did it exhibit by

16   exhibit with the exact case cites and grounds for each one,

17   and they are different.  Some overlap a great deal.

18           THE COURT:  I'm telling you in a briefing you -- if

19   you say Exhibit A through B are not relevant because they

20   relate to something that was here or there or whatever, that's

21   something that is efficient and can be done but you chose not

22   to do that.

23           MR. STALLINGS:  Judge, let me -- please let me try to

24   explain, because this is a very serious charge you leveled

25   against us as counsel for UPMC.

1          THE COURT:  I'm making an observation.  I'm not

2     imposing any sanctions at this time.  When I saw what you

3     filed and I went through it, it was impossible for the court

4     to get prepared for this hearing.

5          MR. STALLINGS:  Judge, there's a reason for that and

6     it's substantive.

7          THE COURT:  You want me to sit here for 10 or 15

8     hours while you go through each one of these?  Is that what

9     you're expecting?  We're going to have a mini trial.

10          MR. STALLINGS:  If I may be heard, please.

11          THE COURT:  All right.

12          MR. STALLINGS:  You said something earlier today that

13     goes to the core of the reason these objections were set forth

14     in the way they were, and the reason there are two or three

15     objections that apply to a large number of the relators'

16     exhibits.

17          To put it into context, there are about 300 numbered

18     exhibits that the relator provided to us.  Over 100 or around

19     100 we stipulated to.  No objection at all.  So at least

20     one-third of them, we said yes, they come in unchallenged.

21          Most of the others fall into three broad categories,

22     one of which was being litigated in the motion in limine

23     context before this hearing but after the objections, and that

24     has to do with the scope of this case, and Your Honor issued

25     an order on the motion in limine related to a request to

1    bifurcate the trial and deal with the original jurisdiction
2    issue.
3         And in that order, Your Honor pointed out that the
4    claims related to these medical director agreements being
5    shams had been abandoned by relator's counsel.  That is
6    literally the first time that that has been announced or found
7    in this case.
8         THE COURT:  I didn't make it up.  I didn't make it
9    up.  That was known for quite awhile.
10        MR. STALLINGS:  But, judge, understand this, that the
11   scope of this case from the relator's perspective includes
12   everything as we know from this exhibit that we're purportedly
13   talking about now from 2001, the scope from the relator's case
14   alleges really that for the entire time period at issue -- the
15   only reason they stop at '04 is because of the statute of
16   limitations.
17        They say from '04 to 2010 that there were
18   Anti-Kickback violations.  That's still their case.  They
19   say -- I think that they're not arguing the word shams, but
20   that's kind of a distinction without a difference, but it
21   should be a distinction with a difference.
22        Most of this set of objections we have raised relate
23   to --
24        THE COURT:  I don't think there's any claims about
25   there being sham services provided, and I'll preclude them

1    from doing that, because that was not what has been

2    represented to the court about what is going forward with this

3    case.

4              MR. STALLINGS:  Judge, we have to talk, so that these

5    objections make sense, about whether or not they are alleging

6    that there were Anti-Kickback violations from '04 to 2008, and

7    that include -- that means if they are -- forget whether you

8    call it sham or not, okay.  A lot of the documents on our

9    exhibit list that relate to, as Mr. Devlin articulated to you,

10   whether services were provided and how well they were

11   provided.

12             THE COURT:  I don't believe that's part of this case.

13             MR. STALLINGS:  That's a big deal.  If it's not, that

14   changes all of this, all of these objections and everything

15   else.

16             THE COURT:  I mean, I've known about that for quite

17   awhile.  I can't believe that you're saying you had no

18   knowledge.

19             MR. STALLINGS:  No, judge.  Let's be clear.

20             THE COURT:  The scope of this --

21             MR. STALLINGS:  Hold on, judge.  If they are telling

22   you right now, I'd like to hear it, that Anti-Kickback from

23   '04 to '08 is not an issue --

24             THE COURT:  No.  It's Anti-Kickback but not on the

25   basis that there was a failure to provide services or that the

1    services didn't have -- were not performed.  I think they are

2    saying there were services that were performed.

3         MS. VERKAMP:  Right, Your Honor.  We had this

4    conversation during the liminal hearing, and we absolutely

5    very clearly have alleged violations of both Anti-Kickback

6    Statute and Stark laws for the entire time frame.  That's been

7    like that all along and we have not withdrawn any part of

8    that.

9         When you asked us whether or not we were asserting

10   there was a sham, I understood that to mean are you asserting

11   that they provided no services for those contracts and that is

12   not what we're asserting.

13        We may assert it's commercially unreasonable because

14   they were undocumented or underreported or underperformed

15   but --

16        THE COURT:  What do you mean by underperformed?

17        MS. VERKAMP:  Meaning, for example, in the contracts,

18   say they contracted for 3 to 400 hours a year and our expert

19   looked at whether or not they documented that they performed

20   services and looked at what those services were and found that

21   a lot of the services were duplicative or related to patient

22   care, so there may have been legitimate services in the form

23   of medical director duties, but it was far under the services

24   that they were actually paid for, which made it commercially

25   reasonable and not -- commercially unreasonable, sorry, and

1    then would not satisfy an Anti-Kickback, safe harbor or

2    exception.

3            That certainly is part of our argument and that's a

4    standard part of an argument in any Anti-Kickback case.  Our

5    argument is not that we have to prove that no service was

6    provided, because that's not the standard under the

7    Anti-Kickback Statute, because even a legitimate service does

8    not override if your purpose of payment is to induce

9    referrals.

10           MR. STALLINGS:  Judge, let me come back to this.  I

11   think what we just heard means that it certainly is relevant

12   and necessary for the defendants to be able to say what was

13   actually done and why with this heart institute.  They're

14   saying the opposite.  We have to be able to defend.

15           THE COURT:  Let's be clear here, because I understood

16   from the last hearing that you might be saying that the

17   charges were -- it's actually the defendant's burden to show

18   that there were commercial -- that the services were at a

19   commercially reasonable rate, and you are going to be

20   defending that by saying they weren't performing services when

21   you told me that's not going to be the basis of your claims at

22   trial?

23           MS. VERKAMP:  So it's two separate things, Your

24   Honor.  The commercial -- fair market value with commercial

25   reasonableness for the purposes of satisfying Anti-Kickback,

1    safe harbor or Stark exception has more to do than just the

2    rate.  They have to pay at fair market value in an arm's

3    length transaction for services that were actually needed and

4    actually rendered.  Those are the elements that compose

5    satisfying both of the elements.

6             THE COURT:  I thought you did not say they provided

7    services that were not needed.  You removed that from the

8    case.  That's what I was told at one of the last hearings.

9             MS. VERKAMP:  That -- we're certainly not arguing

10   that they didn't provide any services pursuant to the medical

11   director agreements.

12            THE COURT:  That's not what you told me.

13            MS. VERKAMP:  From a medical necessity perspective.

14   Is that what you mean?

15            THE COURT:  Yes.

16            MS. VERKAMP:  I'm sorry.  I was kind of ships in the

17   night with what you were asking me.  We're not alleging that

18   any of the underlying services were medically unnecessary, and

19   we allege that's completely irrelevant to what the allegations

20   are, so no, we're not saying that there were any shadow

21   services, shadow patient care services or medically

22   unnecessary patient care services.  That is not part of our

23   case.

24            We're talking about the medical director services,

25   the administrative services that they contracted for under the

1    medical director agreements.  We are assessing --

2               THE COURT:  So the administrative services were what?

3               MS. VERKAMP:  So under the -- let's take the nine

4    medical director agreements.  There were three other

5    agreements too.  They contracted for a certain amount of

6    services.

7               THE COURT:  For administration.  Let's be clear about

8    what services you are talking about here.  Not medical

9    services.  These are administration services.

10              MS. VERKAMP:  Right, or they should be nonpatient

11   care services because patient care services are things that

12   they are paid for by insurance.  If you are conducting a

13   commercially reasonable contract that complies with the

14   Anti-Kickback statute, you're engaging a doctor to do other

15   things, nonpatient care things that are needed and necessary

16   and rendered and at fair market value as you described.

17              What we're saying is those services, not their

18   patient care services, were commercially unreasonable and that

19   they were undocumented and often not performed.

20              So, for example, let's say a doctor attended 40 hours

21   of meetings a year but he was contracted for 400 hours -- I'm

22   just making up these numbers -- 400 hours of medical director

23   services, our expert would opine that is not consistent with

24   industry standards on commercial reasonableness.

25              And another nuance here, some of these services that

1   some of Hamot records documented as compliant with the medical

2   director agreements, some of them are services related to the

3   treatment of patients, so not whether or not their care was

4   okay, but they're counting hours at the hospital where they're

5   saying we were complying with the medical director agreement

6   when really they were caring for patients.

7        We would say you are getting paid twice for those

8   services.  We're not saying they are medically unnecessary.

9   What we would argue is that they are not related to a medical

10  directorship payment and so don't satisfy an Anti-Kickback

11  Statute or safe harbor.

12       MR. STALLINGS:  Few things to clarify, judge.  One of

13  the examples of these medical director agreements is the

14  director of the cath lab.  So when we talk administrative

15  services, this isn't some clerical work unrelated to patient

16  care.  It's not the direct administering of patient care to

17  form a medical claim, but it is clearly related to providing

18  good quality care at the hospital.

19       The director of the cath lab, for example, what he

20  does is he runs the cath lab, helps run the lab, provides

21  input from a physician standpoint on how to better run that

22  lab, what kind of equipment to get, how to staff, how to

23  interact between staff and patients and patients and

24  physicians, and all of that helps provide -- the whole point

25  of it is to provide better care at the cath lab.

1       So what they're saying now I understand is that their

2    case is that, under these medical directorships, the Medicor

3    physicians weren't doing what they were supposed to do,

4    underperforming I think I heard counsel say on these medical

5    director agreements.

6       What Mr. Devlin said and what we would say in trial

7    is they did perform in spades, and here's how, and actually

8    have testimony from people like Grode and Kisiel and those

9    folks who would say we work in that system.  We know what

10   these physicians did pursuant to these medical director

11   agreements.  We know they performed the services.  The doctors

12   will say the same thing, and that's relevant, because it

13   directly rebuts the central core of their case from '04 to

14   2010.

15      So I think just on the scope issue, if that's really

16   the scope of the case, I think it's important we all know --

17      THE COURT:  You have to be very clear when you're

18   addressing the jury that they don't get confused between

19   providing medical services and providing administrative

20   services, and you are going to make it very clear to the jury

21   that you are here not having any claim about the quality of

22   the medical care that was being provided at Hamot Hospital or

23   by any Medicor physician and you are not challenging any

24   service that was -- medical service that was rendered so that

25   that is very clear.

1          What the focus of this case is on are the

2    administrative services that were being provided.

3          MS. VERKAMP:  That's correct, Your Honor.

4          THE COURT:  Because I think the way it was initially

5    presented as a sham, it was as though there were no medical

6    services actually being provided pursuant to those

7    directorship agreements or by the physicians.

8          MS. VERKAMP:  Our argument is not that there --

9          THE COURT:  You have to make that very clear to the

10   jury because that's going to be very misleading otherwise.  To

11   the extent, if that's what the issue is about the

12   administrative services, the focus of the case should be what

13   are the administrative services that were required to be

14   provided and how were they provided, and if you have people

15   who can testify to that, that would be relevant on both sides.

16         MR. STALLINGS:  I appreciate that, Your Honor.  To

17   come back to Your Honor's displeasure with us and the format

18   of these objections, it relates to this issue because two

19   things.

20         One, the scope of the relator's case has been in full

21   dispute.  Our contention has always been that everything after

22   Dr. Emanuele left Medicor in 2005 is beyond the jurisdiction.

23         THE COURT:  I understand.  That's already been ruled

24   on.  You have your objection.  It's preserved for purposes of

25   appeal.

1          MR. STALLINGS:  But when we had to list all these, we

2     had to preserve that at the time, so that's why a lot of these

3     relevance objections --

4          THE COURT:  I have already given you the ability to

5     preserve it.

6          MR. STALLINGS:  I'm explaining why it looks like

7     this.  You are unhappy with me and with counsel for UPMC for

8     how it looks.  I'm trying to explain to you why it looks like

9     this.  We made a good faith effort to do this the best we

10    could under the circumstances.

11         I want to explain how it actually works because if

12    you -- let me give you one example, if I may, judge.  There's

13    an exhibit that the relators identified.  It's R8.  And this

14    is a typical kind of exhibit that they identified on their

15    exhibit list, so out of 300, one like this is fairly typical.

16         It is -- it purports to be two pages.  It's unsigned.

17    There's no indication of who the author is.  It says on its

18    face that it's a draft and it looks like an excerpt of a draft

19    of something.  It does bear a UPMC Bates number at the bottom

20    which means that, at some point in the course of this five

21    year litigation, this was produced as part of the over a

22    million pages of material including electronic material,

23    judge, ESI, that were produced in this case.

24         And so, you know, on the date -- on basically a day

25    or two before the last day required by this court's order to

1    disclose what the exhibits were, we get this listed as an

2    exhibit and so, you know, rather than group this in a group

3    with 40 or 50 like exhibits so you can't actually look at each

4    one and distinguish what our particular objection is, and I

5    know you don't like the format, but we did this on purpose to

6    help.  We actually broke down this exhibit and listed the

7    objection.

8          Now, it looks like some of the objections in our

9    objection box are similar to other objections, and you've

10   called that boilerplate, but when you read this, it's

11   particular.  We objected on authentication and hearsay, which

12   we believe it is.  We also objected on relevance.

13         We could not from the face of this unsigned,

14   unattributed, pulled out of context letter what the relevance

15   of this would be, what the relators intended to do with it.

16         We said that particularly, but then we also said

17   point blank the document is unsigned, the author is unknown.

18   We tried to determine the author.  We couldn't.  And we did

19   this, judge.  We went through, even things like this and we

20   tried to find out who at UPMC had authored the document, and

21   if we knew who had authored the document either from the face

22   of it or through inquiries internally, we stipulated to the

23   document and pulled it out of our objections.  We did that for

24   about 100 exhibits.

25         On this one, we could not determine the author and we

1    indicated that in this box.

2              THE COURT:  Did this come from an e-mail?

3              MR. STALLINGS:  We don't know.

4              THE COURT:  You produced it.

5              MR. STALLINGS:  Judge, we produced a million pages of

6    documents including ESI, and we get this exhibit list of an

7    e-mail that's part of a large production of materials.  It's

8    out of context.  This is the problem I think we had with the

9    question you are asking, and I place it on the relator.

10             During discovery, there were many documents like this

11   that were used at depositions, shown to witnesses.  Witnesses

12   were asked about them by both sides.  When we found that to be

13   the case, we went back and said we understand.  We may have a

14   relevance objection for the reasons we've said but we don't

15   object on authenticity.  We did that.  This is not a

16   boilerplate that I did that to every one.  When you go through

17   item by item, I can tell you what this is.

18             For this one, it's called Hamot Heart Institute

19   regional strategies, and it is excerpts from a draft.  We

20   don't know who necessarily wrote it.  We don't know who it was

21   distributed to.  Maybe they intend to use it with a witness

22   whose name is on the pull out for the C drive and cross them

23   on it, but we don't know that, and we certainly don't know why

24   it's relevant to the issues in the case.

25             THE COURT:  This is why you should be meeting and

1    conferring.

2          MR. STALLINGS:  Judge, the timing of the response due

3    for these objections, the volume of exhibits like this meant

4    that as to each one, we couldn't.  What we did do, we did

5    several things to meet and confer specifically on this kind of

6    stuff.

7          One, anything that we had identified separately as a

8    potential exhibit or exhibit on our own list, we basically

9    stipulated to.

10         On the other side, they didn't do that.  They said

11   because you identified it doesn't mean -- we identified it

12   doesn't mean we don't object to yours.  We did.  We pulled

13   back any objection that we had listed out there.

14         The second thing we did is when we went through and

15   when we can determine individually, it's a pain in the neck,

16   it was for us to prepare it, but we went through and if we

17   could determine where it came from, who authored it, when it

18   was sent and why it's relevant, we pulled the objection back.

19         A lot of these are floating documents.  There's

20   another great example.  There's one, this is their Exhibit

21   189.  I don't want to jump around.  We can go through this in

22   a more coherent way.

23         THE COURT:  I'm not going to sit here for 15 hours

24   and go through each one of these when you, both sides, did not

25   sit down and do your job.

1           MR. STALLINGS:  This is the point, judge, that I

2     would like to get across, and I appreciate you giving me the

3     time to do that.  It is both sides.  We were not being

4     deliberately obtuse here.  We tried to make this work for the

5     parties and the court.  I take that seriously, Your Honor.

6     I'm not here to waste your time or the jury's time.

7           We pulled back on 100 of these kind of exhibits when

8     we did our due diligence and realized it was not a problem and

9     it was authentic.  There are many of these.  I can give you

10    example after example, pieces of paper.  This is an exhibit.

11    It is a page out of the federal registry.  It's Bates

12    numbered, but it was attached to six other things.  There's no

13    context to this.  This is their exhibit.  It's a page out of

14    the federal registry.

15          That can't come into evidence as an exhibit unless

16    there's a basis for it.  There is an answer that isn't you

17    going through line by line, and it does involve maybe more

18    meeting and conferring, but there is an answer.

19          At trial, if they are able to establish that this

20    thing is relevant, we're not going sit here and make frivolous

21    objections.

22          THE COURT:  What you're asking the court to do is to

23    take the jury's time every time one of the -- how many volumes

24    do I have?  All these pages.  I have over ten volumes of very

25    thick books over maybe ten inches tall, and every exhibit

1    because you have 108 pages of objections, we're going to be

2    breaking and going over and taking the time.

3             It's not helpful.  It is not helpful to moving this

4    case forward.

5             MR. STALLINGS:  Can I say this, judge, about that,

6    because the ones we stipulated to, the ones that are on our

7    list are the ones that actually matter to the issues we have

8    heard are in the case, all the contracts, all the

9    correspondence.  Anything that had a name or date on it, we

10   knew what it was.  It's these things taken out of context they

11   want to ascribe some meaning to.

12            THE COURT:  Let me hear from the other side.

13            MR. MORGAN:  Your Honor, Exhibit 8 is actually a good

14   example, I think, because although it's not signed and it's

15   part of a draft, when you look at the line from the computer

16   hard drive, the first name on it is Gary.  There's only one

17   Gary I know who has been identified as a witness in this case

18   and that's Gary Maras, who worked for both defendants,

19   coordinated their efforts to some extent, and he started at

20   Hamot in the mid section of 2008 and worked on these regional

21   development heart institute, how to pay for things, whether to

22   have joint ventures.

23            Those issues were the sum and substance of his work

24   for at least the next six to 18 months.

25            Mr. Maras -- if Mr. Maras looks at this and testifies

1    to the court, no, it's another Gary and I didn't have anything

2    to do with this, that's a different matter, but to object to

3    this on authenticity or hearsay, I believe is as inappropriate

4    with this as with many of the other documents.

5        I believe the court is aware, but very briefly, the

6    2004 date is when -- is the damage period for statute of

7    limitations purposes, but 2004 is a point in a moving stream

8    which started with these events in 1998, 1999 when the groups

9    were looking at merging, when the deal fell apart, when they

10   had to come to grips with needing to find a new way forward,

11   and this document is part and parcel of that.

12       MR. STALLINGS:  Well, on the issue of Mr. Maras, this

13   says draft 10.07.98.  First of all, it says draft.  Apparently

14   is part of the E discovery because it comes off the hard drive

15   but 10-7-98.  98.  Gary Maras was hired maybe a month before

16   that, maybe.

17       So part of the hearsay analysis when you're talking

18   about individuals who work at an entity is whether what

19   they're saying they're saying within the scope of their

20   duties, whether they have the authority to speak for it.  They

21   had this document when they deposed Mr. Maras.  They didn't

22   ask him about it.  They asked him about plenty of others we

23   stipulated to.  They didn't ask him about this.

24       He doesn't remember this draft from a computer file

25   in '98.  We asked him.  He doesn't remember it.

1          So he can't and we can't determine at that time these

2     statements, do these fit within hearsay exception?  They

3     haven't established they fit within any hearsay exception.

4          They haven't established what's relevant about what

5     was news in a draft computer file in 1998 by a one-month-old

6     employee.  That hasn't been proffered.  So I think an

7     objection to this document is not only well founded, it's been

8     set forth very precisely as to this document in this

9     particular -- judge, I call this a mini brief in this

10    objection.  That's what we did.  We put mini briefs in each

11    one of these.

12         That's why it's 108 pages, because we took the time

13    on each exhibit to go through and articulate why this one in

14    particular was objectionable.  That's what we did.

15         This, I don't see the relevance of this.  They

16    haven't articulated it.

17         THE COURT:  I can see the relevance.  I know why they

18    want it in.  Key referring physicians should be courted by

19    appropriate Hamot cardiologists and surgeons ASAP.  These

20    assignments should be made in advance.

21         MR. STALLINGS:  So where is the evidence that this

22    particular --

23         THE COURT:  I mean, you are talking about relevance.

24         MR. STALLINGS:  Where is the evidence?  It has to be

25    a statement they can attribute that was made to people.

49

1    There's no evidence this was ever said to anybody at all.  Not

2    even a statement.  There's no evidence of that.

3         THE COURT:  You are objecting.  None of what you're

4    saying here other than to say there's no signature on this,

5    but you wouldn't have a signature on a draft.  There's not

6    enough context in what you're saying for me to make an

7    assessment.

8         Usually when I try to rule on these beforehand, I

9    have an idea about what the real objection is, and I just

10   don't have it from what you've set forth.

11        MR. STALLINGS:  I would argue, judge, that when

12   somebody seeks to take a page out of context that says draft

13   and --

14        THE COURT:  We see this all the time.  Honestly,

15   that's -- if nobody can identify that, yes, this was mine or,

16   yes, I sent it, that's a different story.

17        MR. STALLINGS:  That's the case.  No one has

18   identified this.

19        MR. MORGAN:  I would simply say, judge, Mr. Maras

20   actually says in his own documents that he labels things draft

21   in order to get buy-in from people.  He labels things draft,

22   circulates them, gets so people feel like they can contribute

23   to the document.  Him labeling something draft is something

24   which the jury will hear about as part of his tactical

25   approach to his work at Hamot in late 1998, but the suggestion

1    that everything that he has --

2          THE COURT:  It can be used to refresh his

3    recollection.

4          MR. MORGAN:  At a minimum, yes.  I think it's clear

5    that he authored the document because the first line on the --

6    unless -- certainly I have to establish with him that when he

7    saves a document in the computer or when he did it in the late

8    1990s, he did it under his name, Gary, and maybe there was

9    another Gary that we don't know about who was writing about

10   these heart institute regional strategy issues in late 1998.

11         THE COURT:  You can see -- how long are we taking on

12   this?  How long is it going to get through each one of yours?

13   It's not efficient, and I'm sorry.  You all did not do a good

14   enough job meeting and conferring about these exhibits,

15   because it is not clear to me from reading it what the nature

16   of the objection really is.

17         You object on the basis of relevance.  I can see it's

18   clearly relevant from what everyone has said here previously

19   today.  At this stage, I'm going to direct you to meet and

20   confer about each one of these.

21         Designate somebody from your team who is

22   knowledgeable and get on it, go work through the night.  Get

23   it done, and if you intend to use any of the objected to

24   exhibits the first week, pull out those, prioritize those and

25   get those done first and work through them that way.

1          Everybody knows I have a requirement that you have to

2     identify each of the next day's witnesses and the exhibits

3     that you are going to use for that witness so everybody will

4     know the night before, and given how complex this case is and

5     how many documents there are, you may want to do it, you know,

6     two days before so that you know we have witness 1, 2, 3 and 4

7     coming up.  We're going to start on day one and go through

8     that, and here are the exhibits we're going to be using for

9     witness 1, 2, 3, and 4.

10          This goes on both sides, because that's the only way

11     we're going to be able to make it efficient for the jury.

12          MR. STALLINGS:  We'll do that, judge.

13          MS. NAPORA:  May I be heard?

14          THE COURT:  Yes.

15          MS. NAPORA:  There's one overarching issue that will

16     streamline our attempts to meet and confer.  That is they

17     objected on the grounds of authenticity to a number of

18     documents that they identified in their interrogatory

19     responses or their responses to the request for production.

20          We have a lot of work to do clearly, but I don't

21     think --

22          THE COURT:  That's not a legitimate objection.

23          MS. NAPORA:  Thank you.

24          MR. STALLINGS:  Judge, also for the meet and confer,

25     I think there's a similar issue on the other side.  They

1   characterize it differently.  Obviously you like their format

2   a lot better.  We'll work with them on their objections to our

3   exhibits and meet and confer with them to try to work through

4   those as well.

5           THE COURT:  I think part of the problem with some of

6   their objections to yours goes to some of the rulings that I

7   made on the motions in limine, so to that extent they are

8   different, and I think I can address some of those here and

9   save you some time, because I had enough information based on

10  the submissions to be able to at least assess on a preliminary

11  basis what my determination would be.

12          I couldn't do that from the objections that you

13  raised.  It was just impossible.

14          MR. MORGAN:  Your Honor, we started this

15  discussion --

16          THE COURT:  Let's talk about the big ones.

17          MR. MORGAN:  Exhibit 306, and the suggestion was made

18  306 came from some third party marketer, but in fact it comes

19  from, as counsel said, a Ms. Sugintas whose e-mail is

20  asugintas@healthgrades.com.  It's not a third party marketer.

21          THE COURT:  Who is Health Grades?

22          MR. MORGAN:  One of the entities that identifies top

23  50 hospitals, for example.

24          THE COURT:  This is somebody who is marketing.  It

25  sounds to me like they are an organization that gives these

1   rankings, and they want you to buy into what their service is

2   or come out and provide you some assistance so you can move up

3   in the rankings.

4          MR. MORGAN:  They might say they are Martindale

5   Hubbell and somebody else may say they are Avvo, but they are

6   recognized.  They hold themselves out as independent --

7   adjudicator is the wrong word.

8          THE COURT:  But that would be hearsay then.  You can

9   say somebody would say something, but that doesn't mean it's

10  true.

11         MR. MORGAN:  It's hearsay if we were submitting it

12  for the truth of the matter asserted.

13         THE COURT:  Isn't that what you want to do?

14         MR. MORGAN:  No, ma'am.  They want to say that health

15  grades were important, top 100 was important.  What this

16  document says is that by being 43rd out of 56 hospitals in

17  Pennsylvania, they were a top 50 hospital.  I think I have the

18  exact parameters of that wrong, but I think this exhibit is

19  important, and that's an issue which really came out at the

20  liminal hearing.  This document is important because it's a

21  little insight, a little window into how these rating

22  organizations operate with respect to the hospitals that then

23  put on their website that they are top 100 or top 50 or

24  recognized by this or that organization.

25         THE COURT:  You can certainly -- Dr. McClellan is not

1    here any longer, so this would have to come in as some form of

2    a business record.

3         MR. MORGAN:  It's a Hamot document.  It's a document

4    Hamot produced from its files and they certainly -- I mean, if

5    the doctors end up not talking about health grades or the

6    administrators end up not talking about health grades because

7    I agree there are hearsay issues around those points, then

8    whether we're allowed to proceed with this document or not, I

9    don't think it's relevant.

10         In other words, I view it as a defensive document

11   because to the extent the suggestion is, well, health grades

12   said we are the cat's meow, I think we should be able, absent

13   the fact this was not timely identified --

14         THE COURT:  You'll be able to cross-examine whoever

15   is making that statement if they understand what the gradings

16   are, and if you have a good faith basis to believe that there

17   would only be 50 hospitals eligible, so that if you are 43,

18   you say you are in the top 50 doesn't mean a whole lot.

19         You can probe them on that to the extent you have a

20   basis for doing that, and if they say they are not aware of

21   it, they don't know what those would be, this isn't going to

22   refresh anybody's recollection, so I don't know how it would

23   come in.

24         You can cross-examine somebody about what it means to

25   be in the top 50 if there's only 50 hospitals.  I would

1    imagine there are people who you'll be -- who will be

2    testifying on behalf of Hamot that do understand what those

3    grades are.

4              MR. MORGAN:  Perhaps.  Just so I'm clear, Your Honor,

5    are you rejecting the addition of the document to the exhibit

6    list?

7              THE COURT:  I am, because I don't think it goes to --

8    I think it's being used for the truth of the matter that's

9    stated therein, and I think there's another way you can get to

10   this information through cross-examination.

11             MR. MORGAN:  Thank you, judge.

12             THE COURT:  Next one, 307.

13             MS. NAPORA:  Your Honor, that's a discovery response

14   and again it's no surprise to them.

15             THE COURT:  What's the relevancy?

16             MS. NAPORA:  Well, we wanted to be able to show the

17   comparison of the medical directors they had in other areas as

18   part of a whole.

19             THE COURT:  What is it relevant to what they were

20   doing with other medical directorships?

21             MS. NAPORA:  It goes to the idea of what is

22   commercially reasonable.

23             THE COURT:  How?

24             MS. NAPORA:  Because, for example, in other areas of

25   the hospital, they may have one medical director and that

1    medical director may actually be performing administrative

2    duties as opposed to discrete medical directors for women's

3    heart health or medical director for this particular part of

4    cardiology.

5            There's no other aspect of the hospital that is so

6    diluted in medical directorships or overdirectored, in our

7    view.  We think that's relevant to show the importance of the

8    medical director payments to physicians in terms of getting

9    referrals.

10            THE COURT:  Aren't we going to be then getting into

11   what is the type of service, administrative service that is

12   provided under these particular agreements and then we have a

13   whole set of side issues with respect to all these other

14   agreements.

15            MS. NAPORA:  Well, one of the issues that I think the

16   experts speak to is what makes a medical directorship

17   necessary, and I think just the fact of the comparison in

18   terms of numbers.

19            THE COURT:  Did your experts look at these

20   agreements?

21            MS. NAPORA:  No, they did not.

22            THE COURT:  Then they won't be admitted.  The next

23   one, 308?  Is that similar?

24            MS. NAPORA:  Yes, it is.

25            THE COURT:  That won't be admitted.  Their form 990s,

1   what's that for?

2          MR. MORGAN:  Your Honor, the form 990s are publicly

3   available IRS filings which all nonprofit --

4          THE COURT:  I'm familiar with it, but why would you

5   want to use it?

6          MR. MORGAN:  It goes to the revenues of the hospital

7   and the compensation of some of the individuals who will be

8   testifying.  So the revenues of the hospital, one of the

9   concerns that we have is that the defendants will attempt to

10  show that or to argue to the jury that a full damage award in

11  this case would be prejudicial possibly to their health,

12  certainly to Hamot, and we think it's important to be able to

13  show, if that comes up, that in fact Hamot's income or

14  revenues is so far above what the damages caused by only the

15  Medicare portion of only four or five physicians --

16         THE COURT:  Are you going to be arguing that?

17         MR. STALLINGS:  Judge, no.  It sounds as if the

18  relators are trying to do an ability to pay argument for

19  damages which is totally inappropriate.  Also --

20         THE COURT:  They're not raising that.  If you have

21  the physicians that testify, to the extent you want to probe

22  them about, if it's relevant, you know, for bias, what their

23  salaries are, you'll be able to ask them that.  You won't

24  needs the form 990.

25         MR. MORGAN:  If the argument is not going to come up,

1   then fine.

2           THE COURT:  It's not permitted.  Hamot leadership

3   form, regional cardiac development slides.

4           MS. NAPORA:  Your Honor, we can withdraw that.

5           THE COURT:  Those are taken care of, so that motion

6   is resolved.  Okay.  Now let's look at the relator's

7   objections.

8           D127 through D140 and D579 through D589 have been

9   withdrawn.  So we're on to the next objection which is the

10  COSA related exhibits.  This has to do with the service that

11  started at the end of the period of the claims.  I don't know

12  why this is relevant.

13          MS. NAPORA:  Your Honor, actually if it helps the

14  analysis, we are happy to change our objections to the

15  following:  Defendant 66, 67, 113 through -- 111, 112, 113 and

16  116.  Those are COSA related documents and that might at least

17  eliminate some of the concern.

18          THE COURT:  So why is COSA relevant?

19          MR. STALLINGS:  Judge, a lot of these -- there's

20  really two main reasons and some ancillary ones.  I'll start

21  with the two primary reasons.

22          THE COURT:  You heard they were only going to certain

23  of these?

24          MR. STALLINGS:  I did.  I was going to

25  cross-reference to what my notes are to each.  I can tell you,

1    generally speaking, two things about COSA are relevant at this

2    trial for sure and some ancillary matters as well.

3            One is that, you know, part of this case, we thought

4    all of it, but certainly part of this case relates to this

5    period when there were two agreements that didn't get signed.

6    The women's heart medical directorship and the CV chair, and

7    there are reasons why they didn't get signed that are very

8    human and explainable, and part of that has to do with the

9    negotiations to put the COSA in place.

10           So a lot of these exhibits relate to the fact that

11   they date from that period and talk about that period.  The

12   COSA went into effect on March 31st of 2010, but it was

13   negotiated for years, and there were times it was about to

14   come into place, and the COSA, in large part, wrapped up these

15   other arrangements, including the women's and the CV chair

16   into the COSA structure.

17           So part of the description of what happened with the

18   signing issue relates to discussions about the COSA.  That's

19   just inherent in that time period.  2008, 2009, 2010 it's very

20   hard to find documents that don't in some fashion relate to

21   discussion of the COSA.  That's part of what you're seeing

22   here.  It's not that we're trying to expand the case into the

23   COSA.  It's that discussion of the COSA relates to back and

24   forth issues that happened in '08, '09 and '10.

25           THE COURT:  Isn't that a lot with lawyers though?

1          MR. STALLINGS:  No, not particularly.  Not in our

2     exhibits, no.  We're certainly not introducing privileged

3     information in that regard.

4          The second is related to what I said.  When the COSA

5     was put into place, the specific arrangements, including the

6     medical directorship, the women's heart care, the CV chair

7     type duties, were discussed and analyzed pre COSA and wrapped

8     up into the COSA, and the validity of the duties and the fact

9     they were performed was part of the analysis.

10          And that's in the period pre COSA.  As I believe the

11     relator has said, they're alleging that the medical

12     directorships did not have duties associated with them that

13     were properly performed or were necessary.  The fact that

14     these were all discussed and wrapped up into the COSA analysis

15     pre COSA is highly relevant to that issue, and a lot of these

16     documents relate to that, so those are the two main things.

17          There are some ancillary reasons why the name COSA

18     and discussion of COSA would come up.  It's not our intention

19     to expand this case post March 31st of 2010.  It's not our

20     intention to try to address with the jury what COSA is.

21          THE COURT:  I guess I don't understand what you will

22     be showing by this.

23          MR. STALLINGS:  As I said, judge, there's two things

24     going on.  One is that the explanation which they're going to

25     say that we either intentionally, knowingly somehow didn't

1    disclose the signed writing.  We have to be allowed to explain

2    to the jury why that piece of paper wasn't signed and why we

3    didn't know about it not being signed.  That ties in directly

4    to the negotiations with the COSA.  It's directly related.

5              It has nothing to do with what the COSA says.  We

6    can't not say the word COSA because it comes about later.  The

7    discussion of the COSA, the documents, the discussion, the

8    timing all relate in part to why this thing wasn't signed.

9    That's part of the case.

10             The second, as I said --

11             THE COURT:  That just shows you more why you knew it

12   should have been signed.

13             MR. STALLINGS:  I don't understand.

14             THE COURT:  You were working to get the signed

15   agreement together.

16             MR. STALLINGS:  To get the COSA.

17             THE COURT:  Signed, right.

18             MR. STALLINGS:  Not signed, no.  To put it in place

19   and have it executed.  It was a mammoth arrangement.

20             THE COURT:  You were still providing these other

21   services, these directorships without any written agreement.

22   There were at least two of them.

23             MR. STALLINGS:  We thought there was one, judge.

24   That's the point.

25             THE COURT:  How did you think there was one?

1          MR. STALLINGS:  That's what the case is about.

2          THE COURT:  I'm saying how does this help you show

3     that you didn't think there was one?

4          MR. STALLINGS:  It explains why one wasn't signed in

5     the normal course as it typically would have been.

6          THE COURT:  Why?  Because you knew you had to work

7     towards a written agreement and you didn't have one.  I guess

8     I don't know that the jury will understand it any better than

9     I do.

10          MR. STALLINGS:  I hope they do when they hear the

11     witnesses testify about what was going on at the time, the

12     fact that the COSA was supposed to come into effect on X date,

13     and that there were certain departments working on getting the

14     COSA together, and those departments overlapped with the

15     departments that had to get the contract signed.

16          You know, it's going to take a couple of hours of

17     testimony in order to get the whole story out, but it's going

18     to come out, and it's critical, I think, to understanding what

19     happened here.

20          THE COURT:  It may not be all that helpful to you,

21     but I'm not the fact finder, so I don't know.  What is your

22     view?

23          MR. MORGAN:  Two points, judge.  First, we certainly

24     understand that they are entitled to try to put on a defense

25     about the fact that they didn't have writings and the effect

1    of that, I'll leave to counsel, but what I heard as the second

2    reason for this is unadulterated backdoor fair market value

3    testimony, and that is wildly prohibited by this court's

4    rulings and by the decisions that the defendants have made.

5         So whether or not somebody looking at the women's

6    contract in 2009 thought it was fair market value when they

7    declined to provide the legal advice, they declined to provide

8    the Fenner fair market value analysis all under cloak of

9    privilege and work product.  That is, I would respectfully

10   submit, sublimely prohibited by the court's prior rulings.

11        What we care about keeping away from the jury under

12   COSA is legal opinions, fair market value opinions, gee, you

13   guys are doing a great job with this contract opinions.

14        Now if they want to use the fact that they were ever

15   so busy with COSA as a reason that the contracts didn't get

16   signed, you know, I see that as very different than, well, our

17   lawyers and accountants looked at this in 2009 and said, hey,

18   it's definitely worth every penny you're paying for it, and I

19   think that is strictly prohibited by the court's rulings.

20        MR. STALLINGS:  With all due respect, the Somerset

21   opinion which is what counsel is talking about, was pre-March

22   31st of 2010 and it was not withheld.  It was fully produced.

23   Those folks have always been available for deposition.  We

24   never claimed privilege.  It's never been litigated as

25   privilege.  It's not a part of the Fenner discussion at all.

1    It's a completely separate group.  They could have asked about

2    it.  It does specifically say they looked at these particular

3    arrangements and found they were okay up to COSA and they did

4    it pre COSA.  Of course that's relevant.  It hasn't been

5    prohibited by any court order.  It's never been claimed as

6    privilege.

7         That's on that side that I was trying to say the side

8    that shows they wrapped these into the COSA.

9         The other part is being able to tell the jury why it

10   fell through the cracks is a very important part of the story.

11   The only way to do that is to describe what was going on with

12   the COSA at the time.  Those two reasons make it relevant.

13   That was the question.

14        I don't see any prejudice to them.  We're not

15   expanding the case out beyond March of 2010.

16        MR. MORGAN:  Respectfully, judge, the fact that they

17   think they can pick and choose which fair market value

18   opinions which consultant's opinions are fair game for trial

19   is highly prejudicial.  I was not here for the court's prior

20   consideration of the advice of counsel issues, but I trust the

21   court will well remember that she gave the defense the

22   opportunity.

23        THE COURT:  He's saying this didn't come from the

24   lawyers.  They've produced it and it's not subject to any

25   privilege.

1          MR. MORGAN:  They produced it, but it's a fair market

2     value opinion after they withheld fair market value opinions

3     that we think were probably negative but we can't see.  The

4     fact that two years after the fact somebody says what you

5     would have done under this writing if you had a writing might

6     have been fair market value in prior years, I respectfully

7     submit is outside the scope of the court's rulings on that

8     fair market opinion point.

9          THE COURT:  You could have deposed them.  As long as

10    it's been disclosed, there's no privilege that attaches to it,

11    these were business appraisals that were done?

12         MR. STALLINGS:  Correct, judge.

13         THE COURT:  Then you know, they can be brought in.

14    They can be brought in, but only materials that were furnished

15    up to March 31, 2010.  Nothing that postdates that.

16         MS. NAPORA:  May I add that I just want to be clear

17    that they're not trying to relitigate the court's order.

18         THE COURT:  No.  We're going to get to that.  Then we

19    have the relator's objections to D7, D582 through D585 and

20    D672 through D674.  These have to do with being able to bring

21    in the prior sham claims that have been withdrawn from this

22    case, so -- I think the defense doesn't quite understand the

23    court's ruling on these types of exhibits.

24         If the relator testifies -- I said he could be probed

25    on this because it would go to his bias and his views, that he

1    could be probed.  Did you file claims about A, B and C?  If he

2    denies it, then they can bring these exhibits in.  If he

3    admits everything, there's not a basis for using it for

4    impeachment purposes.

5          That's how these would be able to come in could be

6    for impeachment purposes or refreshing his recollection if he

7    doesn't remember.

8          But at this stage, you know, these do not come in

9    independently.  It's only, you know, if on cross-examination,

10   there's going to be a need to impeach him, but I said he could

11   be asked questions about, you know, why he brought the case

12   and didn't you say this and why did he withdraw them.

13         So it goes to his bias and his privilege and his

14   prejudices about the defendant, so I said that he could be

15   probed on that, and if he admits it, there's no need for any

16   of these documents.  Is that clear?

17         MR. STALLINGS:  It is, judge.  So just to make sure

18   there's no objection needlessly.  We will call the relator if

19   they don't, so he'll testify, and if they don't, we will ask

20   him about his prior admissions, and if he doesn't admit what

21   he alleged in those pleadings, we'll show him and refresh his

22   recollection.  In opening, I intend to talk about those prior

23   admissions.

24         THE COURT:  What are you going to talk about?  How

25   are you going to do it?

1          MR. STALLINGS:  I'll tell them what he alleged.  The

2     evidence is going to show that in the case.  I can certainly

3     preview what the evidence will show.  I'm not going to argue.

4     I'm going to preview.

5          THE COURT:  Okay.  So is that clear then?  This can

6     only -- these documents can only be used for impeachment

7     purposes in the event the relator testifies to the contrary,

8     and they were not sufficient to refresh his recollection.

9          Then we have the relator's deposition transcript,

10     Exhibit D154.  The defendants are saying they only intend to

11     introduce particular portions but only to the extent they

12     relate to the prior claims in this action.  This again would

13     be an impeachment.  Isn't that what you said?  The defendant's

14     response.

15          MR. STALLINGS:  No.  On the deposition transcript,

16     judge, this is clearly a statement of a party opponent.  I

17     think the deposition transcript, we can introduce his

18     testimony in the prior deposition.

19          THE COURT:  But only if it's relevant.

20          MR. STALLINGS:  I mean --

21          THE COURT:  It's not an admission if there's no claim

22     in here that relates to it.  Are you talking about the prior

23     claims?

24          MR. STALLINGS:  His deposition testimony was on the

25     claims that were alleged in the case and --

1          THE COURT:  But a lot of those have been withdrawn so

2    they are no longer in the case.  They are only relevant for

3    impeachment purposes.  If you sued for breach of contract --

4          MR. STALLINGS:  I want to be clear.  You are going to

5    preclude us from introducing the deposition testimony of the

6    relator in this case?

7          THE COURT:  No.  Only if it's not relevant.

8          MR. STALLINGS:  We asked him about the claims that

9    were alleged in this case.

10          THE COURT:  The original claims and they were

11    dismissed.  Some of the claims were dismissed or withdrawn, I

12    should say.  How could it be an admission against interest if

13    it's not an issue?

14          MR. STALLINGS:  I understand we're allowed to use the

15    deposition of a party opponent who is speaking as a party

16    opponent in the case.

17          THE COURT:  Only if it's an admission.

18          MR. STALLINGS:  I think it shows his bias.  I think

19    it shows his credibility.  I think it shows his motive.  I

20    think it shows the scope of his knowledge.

21          THE COURT:  It would be cumulative to his testimony.

22    I mean, it's not relevant.  I'll hear from the other side.

23          MR. STALLINGS:  One last point.  If it's not

24    relevant, then this relator can't be bringing this case,

25    because we asked him about every claim he made at that time

1   and he hasn't amended his complaint since then.

2        THE COURT:  I thought you wanted to talk about here

3   if they relate to the claims in the case, you can bring it in

4   as an admission, but if it relates to claims that are no

5   longer in the case, then they don't come in.

6        MS. NAPORA:  We couldn't agree more with Your Honor.

7   They're going to have an opportunity certainly to if they're

8   going to call him if we don't.

9        THE COURT:  If you can find a case for me that

10  supports the proposition that a deposition of a party opponent

11  about a claim that has been dismissed or withdrawn can be

12  admitted independently, I would consider it, but I've never

13  seen that.

14       MR. STALLINGS:  We'll certainly do some research on

15  that, judge.  I would reiterate that, regardless of that, if

16  his deposition which we believe it does shows in whole two

17  things, his credibility or lack thereof and the lack of

18  jurisdiction, I think those are both relevant matters to

19  introduce his testimony in whole.

20       MS. NAPORA:  They have every opportunity to cross him

21  if they so choose, so it would be cumulative certainly, but in

22  addition, as Your Honor noted when we started this

23  conversation this afternoon, the idea of medically unnecessary

24  claims is, to the extent that if they continue to inject it

25  into the case that actually exists today, will only serve to

1    confuse the jury.

2         THE COURT:  You have to make it very clear this

3    really rests with the plaintiff in this case to make it clear,

4    you know, to the jury that what is at issue here doesn't have

5    anything to do with the quality or the legitimacy of any

6    medical services that were provided.  It solely relates to

7    administrative functions.

8         MR. STALLINGS:  Judge.

9         THE COURT:  We're not going to try these claims.

10   This issue about the unnecessary medical services is not an

11   issue in this case any longer.

12        MR. STALLINGS:  It is though in the sense that this

13   relator made those allegations and they were false.  We're

14   entitled to show that to this jury.

15        THE COURT:  But they're not being made here.  You are

16   entitled to attack his credibility on that and I said you

17   could.

18        MR. STALLINGS:  That's right.

19        THE COURT:  It's not independent evidence.

20        MS. NAPORA:  I'm sorry, Your Honor.  There are no

21   jury instructions on medical necessity claims because they

22   don't exist.  Your Honor has already ruled on the issue of him

23   being an original source to the extent that was ever

24   implicated which it was never, and this is nothing but a

25   confusion tactic, and we ask the court to not count it.

1        Certainly, as Your Honor says, if they ask him and he

2   denies he ever made an assertion of medically unnecessary

3   procedures being performed, they are more than capable of

4   impeaching him with his deposition testimony or some other.

5        THE COURT:  I'm looking at Rule 609.  A witness's

6   character for truthfulness or untruthfulness.  That's what

7   we're looking at by bringing this in.  You would be under B,

8   "Specific Instances of Conduct."  Then it says, "Except for

9   criminal conviction under Rule 609 extrinsic evidence," which

10  would be this deposition testimony, "is not admissible to

11  prove specific instances of a witness's conduct in order to

12  attack or support the witness's character for truthfulness.

13  That the court may on cross-examination allow them to be

14  inquired into if they are probative of the character for

15  truthfulness or untruthfulness of the witness."

16       MS. NAPORA:  If I may --

17       THE COURT:  It's the nature of it being extrinsic

18  evidence.

19       MR. STALLINGS:  The distinction, judge, is this is a

20  deposition of the plaintiff.

21       THE COURT:  It's the deposition of the plaintiff but,

22  you know, if claims have been withdrawn or dismissed, I don't

23  know that portions of the deposition that relate to those

24  claims are relevant.  They're not admissions for purposes of

25  the case at hand.

72

1          MS. NAPORA:  To piggyback on that --

2          THE COURT:  I'm saying if you can find me a case that

3     deals with that to say a plaintiff's deposition is at all

4     times admissible for every little statement that's made in

5     there, then that's something, but I think it has to be an

6     admission to be admissible, and there's no admission if it's

7     not at issue.

8          MR. STALLINGS:  Judge, what I was referring to, just

9     for the record is Rule 32 generally.

10         THE COURT:  Rule what?

11         MR. STALLINGS:  "Any party may use a deposition to

12    contradict or impeach the testimony given by the deponent as a

13    witness."  And subsection 3, "An adverse party may use for any

14    purpose the deposition of a party or anyone who, when deposed,

15    was the party's officer, director, managing agent or designee

16    under 30(b)(6) or 31(a)(4), so we're an adverse party.

17         THE COURT:  I'm looking at the rules of evidence.

18         MR. STALLINGS:  I understand, but it says, "An

19    adverse party may use for any purpose the deposition a party."

20    That's the starting point.  Obviously it has to be relevant.

21         THE COURT:  Let's look at the rules of evidence.

22    That's what you have to focus on.

23         MR. STALLINGS:  Where I'm struggling, judge --

24         THE COURT:  I've given you the opportunity, if you

25    can find me something.  I'm looking at, you know, how this

1    typically comes in.  Is it an admission?  Is it about a claim

2    that's an issue?  That's how they usually come in.  I guess I

3    just don't know.

4         MR. STALLINGS:  I think his statements are against

5    his interest because they were dishonest.

6         THE COURT:  That goes to impeachment.

7         MR. STALLINGS:  He's the party and he's bringing

8    these claims.  That's why it's relevant in part.  You are

9    asking about relevance.

10        THE COURT:  It's impeachment.

11        MR. STALLINGS:  Except he's a party, so it's

12   different is my suggestion.

13        THE COURT:  You got to find me something on that.

14   It's going to be excluded without prejudice, unless it's for

15   impeachment purposes solely.

16        MR. MORGAN:  Just to clarify, judge.  I assume in

17   that case, it would be the excerpts of the deposition that are

18   relevant to the subject of the impeachment rather than the

19   entire deposition.

20        THE COURT:  Yes.  The whole deposition has to come

21   in.

22        MR. MORGAN:  Which is the exhibit that's before the

23   court.

24        THE COURT:  Right.

25        MR. STALLINGS:  For our part, judge, it's our

1    contention we are permitted to use his deposition at trial for

2    any appropriate purpose, and I think his deposition is

3    relevant.

4           THE COURT:  Show me where that is in the rules of

5    evidence.

6           MR. STALLINGS:  We'll get you the case, judge.  I

7    appreciate the opportunity to do so.

8           THE COURT:  Okay.  Then there's Exhibit D4 through

9    D6.  The relator is arguing some may be relevant; some may not

10   be.  This has to do with the original source which I've

11   already ruled on.

12          This is one you have to meet and confer on because if

13   some of them are in, some of them are out.  This is another

14   one, I can't make a decision, because I don't have a basis

15   unless we go through each one.  You are only talking about

16   three documents.  Meet and confer on these when you are going

17   over the defendants' objections.

18          MR. MORGAN:  Yes, ma'am.

19          THE COURT:  Exhibits D578 and D675, these are two

20   summary exhibits that were never provided to the relator and

21   they haven't sufficient time to evaluate the access to it.

22   You are going to have to do the best you can.

23          MS. NAPORA:  Can I make a comment on that?  We did

24   get D578 as a late produced summary exhibit, but we note that

25   they have offered no summary witness to speak to that exhibit

1    so --

2           THE COURT:  Who's going to be your witness?

3    Mr. Stallings, who's going to be your witness on the summary

4    charts?

5           MR. STALLINGS:  Paul Hanna will be the witness who

6    will summarize that data.  The issue here, judge, is that what

7    he testifies to, if anything, is going to depend on what the

8    relators are able to show and what damages they are able to

9    educe, what period.  That depends upon what they put on, so we

10   want to make sure they were on notice that Mr. Hanna -- this

11   is the issue they know all about, which is the calculation of

12   the claims amounts and all that.

13          Fortunately, I think the parties have come very close

14   on the math on that, so it may not be an issue, but to the

15   extent it is, we wanted them to know this is what we're going

16   to do, just get a guy to come up and explain what the numbers

17   actually.  It depends on what they put up.

18          MS. VERKAMP:  Your Honor, this has to go to the

19   summaries of the claims that both parties have access to, and

20   defendants have alleged that certain claims are duplicative.

21   We did a hard scrub, did the best we could to make sure there

22   weren't any, took a hard look.

23          We tried to confer with defense counsel about this to

24   say point out which they are.  This is not our goal.  We

25   should all be on the sage page on these.

1        THE COURT:  Continue to meet and confer about that.

2        MS. VERKAMP:  Mr. Stallings has said he can't meet

3   and confer until he sees what information we put on, though we

4   produced a summary exhibit.  This is an issue I think that --

5        THE COURT:  You can have plenty of time over the

6   weekends once your case is in to meet and confer about this.

7        MS. VERKAMP:  Thank you.

8        THE COURT:  There should be no surprises.  If there's

9   going to be a summary exhibit by the defense that hasn't been

10  produced, you are going to have to produce it at least 72

11  hours in advance unless you get a court order to the contrary

12  to shorten the time.  Did you hear that, Mr. Stallings?

13       MR. STALLINGS:  I did, Your Honor.  Thank you.

14       THE COURT:  That should give you enough time to have

15  your experts go over it.  72 hours.

16       Meeting minutes.  This is Exhibits D107, D164, D167

17  through D225, and there's minutes for every meeting.  Who's

18  going to be introducing these and what do you expect the jury

19  to garner from having all of these minutes?

20       MR. STALLINGS:  Part of what we heard today as the

21  relator's case is this allegation of underperformance of the

22  duties of the medical directorship, and these meeting minutes

23  talk about, in part, what the CV chair and others did

24  specifically in furtherance of the duties for which they were

25  paid and in furtherances of the legitimate duties of their

1      various directorships and arrangements, so we think it shows

2      the work that was done, and if the allegation is it wasn't

3      done --

4                THE COURT:  These are the minutes of the medical

5      directorship?  Whose minutes are these?

6                MR. STALLINGS:  There's various kinds of minutes in

7      there, judge, but there's things called ad hoc committee,

8      cardiology department meeting minutes.  The only reason they

9      were listed was they were actual minutes.

10               THE COURT:  Are we talking about the medical services

11     or administrative services?

12               MR. STALLINGS:  They're talking about who went to the

13     meetings and what topics were at issue as opposed to what was

14     said at the meetings.  We understand there's an issue about

15     hearsay within hearsay.  That's not why these were introduced.

16               THE COURT:  Come up with a limiting instruction then,

17     okay.  That can be admitted subject to a limiting instruction.

18               Then we have Exhibits D008 through D017.  The relator

19     is contending that these reports relate only to claims that

20     have been withdrawn, that those relate to unnecessary cardiac

21     procedures.  Why would these be relevant?

22               MR. MORGAN:  Your Honor, could I just -- I'm sorry to

23     go out of order.  Another concern with these exhibits is they

24     have patient names.

25               THE COURT:  All of that has to be redacted.  Any

1    patient name or personal information has to be redacted.

2         MR. MORGAN:  And what they could possibly be relevant

3    to, given the fact that the relator voluntarily dismissed the

4    medical necessity claims, we don't see.  We think the fact

5    that there are detailed accounts of people's health procedures

6    makes them especially inappropriate.

7         MR. STALLINGS:  We agree on the HIPAA issue.

8    Certainly before anything is used in court, we'll confer with

9    parties and anyone else necessary in order to make sure no

10   patient care information is disclosed.  We've done that

11   throughout this case and we'll continue to do that here.

12        I would concede, unless there is some allegation on

13   the specific necessity of specific kind of procedure --

14        THE COURT:  They won't come in.

15        MR. STALLINGS:  If it comes up, we wanted them aware

16   of it.

17        THE COURT:  It would only come up in rebuttal so they

18   won't be able to be used in the case in chief.

19        Then we have miscellaneous objections.  D156 through

20   D160, D163, D165, D55, D601 through 602, D621, D628, D639,

21   D642, D653 through D661, D663, D665 and D667.  Now, these are

22   ones that I did look at.  What is the relevancy of these?

23   They're going to the CV department, chair directorship and the

24   women's heart directorship.  Can I see those exhibits?  What

25   is your objection?

1             MS. NAPORA:  As a general matter, it is relevance to

2   each of these.

3             THE COURT:  Why do you want to use these?

4             MR. STALLINGS:  Your Honor, you may recognize many of

5   these from our summary judgment papers.  They have two

6   independent bases of relevance.

7             One, as referenced in the summary judgment briefing

8   and in the statement of facts, these are part of a collection

9   of writings that we had suggested form the basis of a written

10  understanding for the arrangement regarding the women's

11  position and while the court ruled that there was not a

12  sufficient collection of writings to satisfy the writing

13  requirement, it certainly is relevant to show that Hamot

14  intended for there to be a sufficient collection of writing

15  which is sort of the issue in our case.

16            Second, they do relate to the kinds of duties and the

17  expectations for the women's role, the women's directorship

18  position and that goes to the issue we've heard about today

19  before about what were the duties, were they performing them,

20  were they underperforming them.  This relates to both of those

21  issues.

22            MS. NAPORA:  We just simply don't see the relevance

23  of these documents.  We can certainly address them on a

24  nightly basis if they seek to introduce them once there's

25  context for them, but in a vacuum, we don't -- it's not

1    apparent to us.

2          THE COURT:  Like D158, it doesn't strike me as being

3    particularly relevant and could be confusing.  Talking about

4    coding and patients having no diagnosis.  I think you need to

5    be -- I think, if you want to talk about what the program is,

6    what you were doing there, the plan, the women's strategic

7    plan, that probably could come in for some of that background

8    information, but I think you have to be --

9          MR. STALLINGS:  Judge, I can assure Your Honor that

10   we're not going to be cumulative in what we present.  If you

11   take 158 in particular, it may or may not be the most

12   persuasive or necessary part at the time, but it may be

13   because it does say point blank, "We will be seeing patients

14   related to a new initiative between Hamot and Medicor.  The

15   program is called women's heart program."  There's a date of

16   June 21st, 2007, and there's certain recipients to this.

17         So it is part of a collection of written documents

18   that corroborate the testimony that they were establishing a

19   legitimate women's program.

20         THE COURT:  You are not going to be able to try to

21   backdoor the court's ruling that there was insufficient

22   writings to substantiate a written agreement.

23         MR. STALLINGS:  We can't backdoor the ruling, judge.

24         THE COURT:  Why do you want to say that you had all

25   these writings to show that?

1          MR. STALLINGS:  Two reasons that are absolutely

2     critical to the defense of the case at its core.  One that

3     Hamot believed they had satisfied these requirements, so how

4     else do we show that?

5          THE COURT:  You believe you had a written agreement

6     when you didn't?

7          MR. STALLINGS:  Judge, the issue in the case is

8     whether they knowingly submitted the claim thinking they were

9     in violation of Stark.  We're entitled to show that they

10    believe they were complying with the various requirements at

11    issue.  That's one of the keys to the case.  I don't think

12    there's any doubt about that.  Second --

13         THE COURT:  You want to argue to the jury that you

14    really did have a written agreement?

15         MR. STALLINGS:  How would I be able to argue that?

16         THE COURT:  You will not be able to, at least on the

17    two I've ruled on.  You don't need that exception.

18         MR. STALLINGS:  Right, but I mean, at a minimum,

19    we're allowed to argue that we believe we did.  That involves

20    talking about what existed at the time by way of writings

21    about this.  It involves explaining to the jury that this was

22    a real thing that was planned.

23         THE COURT:  You want me to give an instruction to the

24    jury that the court has ruled as a matter of law that you did

25    not meet that written agreement?

1          MR. STALLINGS:  I think you are already instructing

2     them.

3          THE COURT:  You are not going to be able to argue to

4     the jury that you had a written agreement that satisfied

5     Stark.

6          MR. STALLINGS:  I don't understand why that's even a

7     question, judge.  Of course we're not.  We're absolutely

8     entitled to argue that there were writings that talked about

9     these duties, that the duties were real, that they were

10    discussed, that they were performed, that there were this

11    collection of writings that they had in place, that there was

12    a draft contract for her directorship position.

13         All of that relates to whether or not there was ever

14    any intent to not have a writing.

15         THE COURT:  I don't think that's the standard.

16         MS. NAPORA:  The intention to not have a writing is

17    not at issue in this case.  The issue is whether they

18    submitted -- knowingly submitted false claims to the

19    government and we allege in violation of Stark and the

20    Anti-Kickback Statute and knowingly encompasses not just

21    actual knowledge, but we do not have to show that they

22    meant -- I'm not even sure what he wants to show, but it's not

23    at issue here.  I don't understand.

24         MR. STALLINGS:  I can explain.  They have to show

25    intent.  That's one of the elements of the False Claims Act.

1        MS. NAPORA:  Intent as it relates to the False Claims

2    Act.  We have to show they knowingly submitted claims with

3    reckless disregard for the --

4        THE COURT:  It's a different standard for knowingly

5    under the False Claims Act.  Congress amended the statute to

6    make that clear because there was confusion.

7        MR. STALLINGS:  Regardless of -- the standard doesn't

8    matter to the relevance of this.  What they believe they were

9    doing at the time is absolutely relevant.  Whether it's

10   reckless disregard or knowing or specific intent.  It doesn't

11   matter what they believe they were doing at the time and

12   whether they understood that what they were doing was

13   compliant or noncompliant is directly relevant to the only

14   issue in this case.

15       We can't be precluded from introducing the set of

16   documents that talk about the creation of the very program

17   they say we intentionally concealed from the government.

18       THE COURT:  I'm saying that's certainly background to

19   what the program is.  I'm concerned that what you really want

20   to try to do is show we did in fact have a writing.

21       MR. STALLINGS:  Why would you say that, judge?

22   You've already ruled against us on that.

23       THE COURT:  That's what you keep saying.  You want to

24   show that they believe they had a writing.

25       MR. STALLINGS:  That's different than that they did.

1           MS. NAPORA:  Your Honor, I think some of the

2     confusion is they are conflating the women's health program --

3     we're not alleging that there's a lack of existence of a

4     women's health program.  That has no relevance to our case.

5           If that's not clear, now it is.  What we're saying is

6     they had a financial arrangement for designated health

7     services and made referrals and in violation -- no exception

8     to the Stark law in existence at the time.  That's already

9     been established.  Your Honor has already done that, so this

10     issue of what you knowingly submitted false claims to the

11     government in violation of the False Claims Act has nothing to

12     do with whether or not women's health program was in existence

13     or they were thinking about women's health program in 2007.

14     It has nothing to do with it.

15           MR. STALLINGS:  Part of their claim, I think, is

16     still that services under all of these agreements, including

17     the women's program, were not provided or underperformed.

18     These documents at a minimum relate to that.  There's no

19     question about that.  They talk about what it's going to do,

20     that it was real, all of that.

21           THE COURT:  That is where we have to be clear we're

22     only talking about administrative services.

23           MS. NAPORA:  We also have to be clear that the issue

24     of underperformance does not come into play when we're talking

25     about women's health and the director of the CV.  The issue

1    underperformance only comes into play when it's their burden

2    to show that they satisfied an exception.

3          Your Honor has already ruled they did not and cannot

4    satisfy an exceptions to that time frame for those

5    arrangements, so this issue of what was performed under the

6    women's health directorship, I'll use air quotes for that, or

7    what was performed under the CV arrangement is not at issue.

8          MR. STALLINGS:  Judge, you know, for the relators to

9    prevail on the intent element, they have the burden on that

10   element.

11         THE COURT:  It's not intent.  It's knowingly.  Intent

12   is different than recklessness.

13         MR. STALLINGS:  Knowingly is the intent standard in

14   this case.  We agree.  But intent is it what we call that

15   element.

16         THE COURT:  Intent is a little different.  It's a

17   tougher standard than what they have in the statute.

18         MR. STALLINGS:  But they don't have a negligence

19   standard in this case.  They don't have a real recklessness

20   standard.  This reckless disregard concept is a way to, in

21   certain circumstances that are narrow, prove knowledge, but

22   the knowledge in this case that they're seeking to prove is

23   that claims were submitted not knowing, whatever subset of

24   knowing you want, but knowing that these programs were being

25   paid for and Stark wasn't satisfied as regard to these

1    programs.

2         How do you defend against that without explaining to

3    the jury what Hamot knew or believed at the time?  How else do

4    you defend the case, judge?

5         MS. NAPORA:  Your Honor, I don't know what else to

6    say.  This is an issue that Your Honor decided in summary

7    judgment.  They made their case in summary judgment.  They

8    lost summary judgment on this issue.  It is certainly -- we

9    have never, and opposing counsel has tried to insist we're

10   trying to do this.  We're not trying to say we don't have the

11   burden to show that they knowingly submitted false claims to

12   the government for payment.  That's our burden, and we're

13   going to show that, but what we don't have to show is that

14   they satisfied an exception at a time frame when Your Honor

15   has already ruled they did not.

16        THE COURT:  That's going to be made clear in the

17   preliminary charge and made clear again in the final charge.

18   My concern is that it's going to be confusing to the jury that

19   they're going to be arguing that, yes, indeed you believe

20   there were writings but this judge found we didn't.  I don't

21   know how else that's going to come across.  That's

22   problematic.

23        MR. STALLINGS:  Judge, you are specifically

24   instructing them that you found --

25        THE COURT:  You don't want them to ignore the

1    instruction and find out that you did.

2         MR. STALLINGS:  No.  Stark is different than the

3    False Claims Act standards, and their burden on the intent is

4    separate and apart from whether or not Stark was satisfied.

5         THE COURT:  It's not intent.  It's knowing.

6         MR. STALLINGS:  The knowing standard is separate and

7    apart from whether Stark was violated here.

8         THE COURT:  I've given you that.  I put that in the

9    preliminary charge.

10        MR. STALLINGS:  That's right, and that's the law, so

11   because of that, we're allowed, and absolutely it's critical

12   that we be allowed to tell the jury what they thought was

13   going on here with these contracts, because they're going to

14   attempt to argue, judge, that we were reckless about this,

15   that we didn't care about whether or not these contracts were

16   signed and in writing.  Meanwhile we have a series of writings

17   that shows we were not reckless.

18        THE COURT:  They are not writings in the sense that

19   it was sufficient to satisfy Stark.

20        MR. STALLINGS:  We're not saying that.  We're going

21   to say we weren't reckless, and these documents talk about

22   that.  They talk about a lack of recklessness, whatever

23   they're going to argue is the standard.  This goes against

24   this.  That's why they're fighting so hard to keep this out.

25   It's a critical part of our defense.  We can't defend the case

1   on their knowledge element without being able to show what

2   Hamot actually did to get these things signed and documented.

3          MS. NAPORA:  I think we're back to the earlier COSA

4   thing.  I think that's where he just went.

5          THE COURT:  I think this is going to cut against you,

6   because you are going to have the court's instruction that

7   these are not sufficient and they're not the kind of writings

8   that give rise to -- I've gone through that, and I'm going to

9   then have to say what is a sufficient writing, and I'm going

10  to have to instruct the jurors about why I found that these

11  were not sufficient writings.

12         MR. STALLINGS:  Why?

13         THE COURT:  Because if you want to say that we

14  believed it and it's to the contrary, it's going to be very

15  problematic, so as I said, if you do this -- I mean, you can

16  put these in through background, but if you are going to make

17  those kind of arguments, I'm going to have to tell the jury

18  exactly why these are not sufficient writings as a matter of

19  law.

20         MR. STALLINGS:  We're not arguing anything contrary

21  to your orders.  We never intended to and we will not.  That's

22  never been our plan.

23         THE COURT:  You'll be forewarned, because if you do,

24  then I'm going to tell the jury exactly why these were not

25  sufficient and what is a writing that would be sufficient.

1          In fact, I have to do that anyway because there are

2     those other situations where, you know, it can go either way.

3     I said it was a fact question to be determined by the jury and

4     I'm going to have to be describing that anyway, and I'll tell

5     the jurors at that time in the final charge that these

6     documents did not rise to that level for these reasons and

7     explain it, if you are going to make that argument.

8          MR. STALLINGS:  As I said, judge, we have no

9     intention of making the argument that they satisfied the

10     writing requirement for this agreement.  You already ruled on

11     that.  It doesn't go to that.  It goes to the knowledge of it.

12          MS. NAPORA:  I'll say this, and then I hear you.  A

13     program is not the same as a directorship.  What they were

14     doing in 2007 has no bearing with respect to -- this program

15     they were considering creating has no bearing on the

16     submission of false claims that occurred from 2008 to 2010

17     during which time they were in violation of Stark.

18          THE COURT:  My understanding is they were creating

19     this program and then they determined it would be appropriate

20     to have a director to oversee the program, and that's when

21     they then hired the director, and then eventually in 2010,

22     they had this other COSA agreement.

23          So I mean, it's part of the background leading up to

24     that and explains what was happening.  I don't have a problem

25     with it coming in for the background purpose.  My only concern

1    is trying to clear up for the jury so there's no confusion

2    about this writing issue.

3            MS. NAPORA:  Thank you, Your Honor.

4            THE COURT:  Subject to those limitations and the way

5    the court will instruct the jury, those can come in, but I

6    need to go back for a minute, because I did review and I need

7    to go back to the COSA exhibits.

8            I saw a lot of those exhibits had to do with the

9    attorneys, and there's lots of e-mails from attorneys,

10   essentially what I consider to be legal assessments and giving

11   legal opinions about various matters, and my view on that is

12   if you have a witness that can testify to the COSA

13   relationships, you can do that, but these exhibits which are

14   from lawyers are not going to come in.

15           MR. STALLINGS:  Judge, may we know what exhibits you

16   are referring to, please?

17           THE COURT:  Yes, let's take a look at these.  I'm

18   looking first at D117.  That would not be admitted.

19           MR. STALLINGS:  117?

20           MR. MORGAN:  Your Honor, if I'm not mistaken, 117, we

21   didn't object to.  That's a 2004 document.  It is a document

22   from a lawyer, but I believe that in the context of the

23   earlier rulings, it's got nothing to do with COSA, and if I'm

24   not mistaken, we didn't object to it.

25           THE COURT:  You did not object to that?

 1                MR. MORGAN:  No, ma'am.

 2                MS. NAPORA:  We did as to the court's earlier ruling

 3       on role of counsel but not as a COSA related.

 4                THE COURT:  Is it in or out?  I think it's out.

 5                MS. NAPORA:  We objected to its use as being outside

 6       the court's order on role of counsel.

 7                MR. MORGAN:  I misspoke, Your Honor.  Excuse me.

 8                MR. STALLINGS:  I thought your ruling in the motion

 9       in limine kept this one in and that's why we had to address it

10       today.  That was my understanding.

11                MS. NAPORA:  I think it speaks to the fundamental

12       difference we have in the understanding of Your Honor's order.

13                THE COURT:  Are you objecting to this exhibit or not?

14                MR. MORGAN:  We'll withdraw the objection to this,

15       Your Honor.

16                THE COURT:  Okay.  Tell me where in these documents

17       that relate to COSA you feel that it shows that the attorneys

18       were heavily involved?

19                MS. NAPORA:  I believe that starts at 616.

20                MR. MORGAN:  Your Honor, we identified in that regard

21       616, 632, 633 which are opinion letters from a law firm

22       regarding COSA compliance with Stark and AKS.  627 is an

23       e-mail from counsel regarding COSA.  629, Stark analysis of

24       COSA.

25                THE COURT:  Give me the numbers again.

1          MR. MORGAN:  616, 632, 633, 627, 629.

2          THE COURT:  Let me take a look at those.  616 is just

3     the agreement itself.

4          MS. NAPORA:  We'll withdraw.

5          THE COURT:  That's fine.  632.

6          MR. MORGAN:  Starting at Bates 001150 is a letter

7     from -- it's much earlier than that.

8          MS. VERKAMP:  01103.

9          MS. NAPORA:  Page 9ish of that document.

10          THE COURT:  Confidential attorney-client privileged

11     document.  That won't come in.  The agreement can come in.

12          MR. STALLINGS:  May I address that, please?

13          THE COURT:  You may, unless you're going to waive the

14     privilege.

15          MR. STALLINGS:  We did.  We produced this document.

16          THE COURT:  You are going to be relying on the

17     defense of counsel.  We've already been through this.

18          MR. STALLINGS:  This is a different kind of document.

19     This was attached to the closing binder for -- I'm not trying

20     to offend you.  I'm trying to make the argument.

21          This was attached to the closing binder, akin to a

22     legal opinion letter that's attached to a complex closing

23     binder in many complex transactions.  It was produced multiple

24     times to the defense.  Never withheld as privileged.

25     Mr. Danch was obviously submitted for deposition.  They had

1    the opportunity to depose the author.  This has never been

2    claimed as privileged.  We never stopped them from fully

3    discovering everything about this letter.

4            THE COURT:  This was an opinion to a third party?

5            MR. STALLINGS:  One of the reasons it was produced is

6    it was produced to both Medicor and Hamot as part of the

7    closing and attached to the closing binder, and Medicor and

8    Hamot were adverse parties on that transaction so we didn't

9    assert a privilege, we didn't claim a privilege, we didn't

10   withhold it based on privilege, and everything about this

11   document has been fully available for discovery by the

12   relators.

13           MR. SIMPSON:  Your Honor, may I address this briefly?

14   This goes back to our frustration with this whole case.  It's

15   that the defendants have wanted to pick and choose which legal

16   opinions they will say are not privileged because we gave them

17   to somebody else and therefore we're not relying on privileged

18   stuff while at the same time they're seeking to withhold other

19   privileged legal opinions that they got.

20           The question is not whether they waived the privilege

21   as to this one document by producing it to Medicor or a third

22   party.  The question is are they relying on the role played by

23   counsel, and if they are relying on the role played by

24   counsel, then that's a waiver of the privilege altogether.

25   That's what we litigated years ago.

1          So they made it clear that they are not putting the

2     role of counsel into play, so they can't do it by a backdoor

3     by producing a legal opinion relating to the COSA agreement.

4          THE COURT:  This is going to be a very hard point for

5     a jury to understand.  I'm going to say that the confusion to

6     the jury will outweigh any probative value of this agreement,

7     so it will not be admissible.  It will be confusing.

8          The jury will have to understand that they are not

9     relying on it for a certain purpose, and then yet it's here,

10    and you can cite it for various reasons, but the agreement

11    itself can come in.

12         MR. SIMPSON:  Yes, Your Honor.  The larger point is,

13    as we discussed at length at the last hearing, is that the

14    more they get into -- here's a lawyer saying everything is

15    okay.

16         THE COURT:  I've already ruled on this.  It's going

17    to be too confusing for the jury not to understand how this is

18    merely background and not advice of counsel that was relied

19    upon.

20         The next one is --

21         MR. MORGAN:  633, Your Honor.

22         THE COURT:  Let's look at 627.

23         MR. MORGAN:  632.

24         THE COURT:  I need 627.  What's the purpose of this

25    other than to show that the lawyer was sending this over?  You

1    can do the -- the agreement can come in, that's part of that,

2    but not the cover letter.

3              MR. STALLINGS:  Judge, the cover letter does not

4    include advice of counsel on legality.  It doesn't address the

5    issues that were in that Lindquist letter you just ruled on.

6    It does attach the draft of the COSA agreement and --

7              THE COURT:  Who is Michael Butler?

8              MR. STALLINGS:  He was a consultant who was involved

9    in structuring and drafting the -- assisting with the

10   structuring and drafting of the COSA agreement, judge.

11             MR. MORGAN:  If I may, Your Honor, this seems to fit

12   uniquely within your 403 analysis.  The bottom paragraphs

13   talks about the COSA budget, whether certain items increases

14   have or have not been substantiated.  It's well outside the

15   damage period, and I see no probative value to anything to do

16   with issues before the jury, but certainly to the extent there

17   is any, it's highly likely to confuse.

18             MR. STALLINGS:  Judge, I think I can make this easy.

19   This cover memo has, we believe, some relevance, but the COSA

20   is coming in, the agreement itself and the schedules to it.

21   We will withdraw this particular exhibit in light of your

22   prior ruling.

23             THE COURT:  Okay.  I need to look at the next book of

24   exhibits.  You all are going to be using the technology to

25   show these exhibits to the jury; is that correct?

1          MR. MORGAN:  Yes, ma'am.

2          THE COURT:  So we're going to need one set for them

3    to take back to the jury room.

4          MS. NAPORA:  One set in hard copy?

5          THE COURT:  Yes, hard copy.  If you want to give them

6    thumb drives or DVDs, you have to meet and confer about that

7    and you have to give them a clean computer so they can call it

8    up easily if you want to do that.  That would be all right.

9          MS. NAPORA:  I think the summary exhibits lend

10   themselves -- almost require a clean laptop and being sent

11   back that way, because they are giant Excel.

12         THE COURT:  Here's 629.  Who are the lawyers here on

13   this?

14         MR. MORGAN:  We object -- this falls within our

15   objection.

16         THE COURT:  How does it fall within the objection?

17         MR. MORGAN:  Who the individual lawyers are, I'm not

18   sure but Mr. Lindquist --

19         MS. NAPORA:  We understand that the man who sent it,

20   David Melloh.

21         THE COURT:  Is he a lawyer?

22         MR. MORGAN:  Yes.

23         MR. STALLINGS:  David Melloh is a lawyer at Lindquist

24   and Vennum, yes, Your Honor.

25         THE COURT:  I don't see why that would be relevant so

1    it will be excluded.  That is 632.  They withdrew 629.

2              MS. NAPORA:  Okay.

3              THE COURT:  I'm sorry.  This is 629.

4              MS. NAPORA:  And 630 also is an e-mail exchange from

5    the same lawyer.

6              THE COURT:  It's from one lawyer to another lawyer?

7              MR. STALLINGS:  630 is from David Melloh who is a

8    lawyer to Michael Butler who is a consultant and Gary Maras,

9    Lisa Irwin, Chris Harhbea is a CPA, Tina Gregory, who is an

10   administrator and some others.

11             THE COURT:  I think this looks more like legal advice

12   to me in terms of structuring the agreement.

13             MR. MORGAN:  In particular, Your Honor, it purports

14   to characterize and restate OIG guidance.  High potential to

15   mislead.

16             THE COURT:  That will not be permitted.  That is 629,

17   630.

18             MR. STALLINGS:  So we can be clear, the basis for

19   excluding this is that it's attorney advice?

20             THE COURT:  It appears to me to be attorney advice.

21   There's a lot of other terms in that.

22             MR. STALLINGS:  For the record, judge, this was not

23   withheld on the basis of privilege.  It was produced to two

24   sides in the negotiation.  It's not labeled as attorney-client

25   privilege discussion.  Mr. Melloh's role included structuring

98

1   and doing fair market valuation work in connection with this,

2   at least guiding how that would be done.  This document again

3   was produced to the relators and their counsel.

4        THE COURT:  It appears to be that you're relying on

5   the advice of counsel for purposes of determining what the

6   agreement would be and this would just show how you are

7   relying on the counsel.

8        MR. STALLINGS:  I can clear that up, judge.  COSA is

9   not an issue in the sense of whether or not it was entered

10  into with or without advice of counsel.  COSA is at issue in

11  the sense that these negotiations in 2009, as I said before,

12  tie into --

13       THE COURT:  You can ask the people that were involved

14  in it who are the business people, but you have to avoid

15  bringing in the lawyers, and so I think that will be excluded.

16  I think it's way too confusing for the jury to try to

17  understand what the role of the counsel was.

18       That brings us to 632.  Is this the same one that I

19  precluded earlier?  It's just a separate version of that; is

20  that correct?  Was this the same one that was attached to the

21  agreement?

22       MR. MORGAN:  Your Honor, I may have lost the thread

23  briefly.

24       THE COURT:  D632.

25       MR. MORGAN:  You just excluded 632, Judge Conti, and

1    I think 633 is the remaining exhibit in this category.

2              MS. NAPORA:  Yes, it is the same letter.

3              THE COURT:  Same one to the other one?

4              MS. NAPORA:  I was double-checking the date.

5              THE COURT:  Then we have a new one here, November 30,

6    2010 which is way past the date of the agreement in any event,

7    so it would not be permitted on that basis alone.

8              MR. MORGAN:  Thank you, ma'am.

9              THE COURT:  Are those all of them that implicated the

10   attorney role?

11             MS. NAPORA:  Yes, Your Honor.  The rest are

12   consultants.

13             THE COURT:  Those that I've indicated are not going

14   to be admissible for the reasons I've set forth on the record,

15   they will be ordered not to be admitted, and the objection is

16   sustained as to those.

17             MR. MORGAN:  Your Honor, just as a logistical matter,

18   the exhibits the court has ruled not to come in should come

19   out of the books.  Should they be placed in a separate book

20   for excluded exhibits?

21             THE COURT:  You can put it in an excluded book if you

22   would like to.  You might need them for purposes of appeal.

23             MR. MORGAN:  That's my assumption.  Defendants are

24   keeping an eye on the third circuit.

25             THE COURT:  I think I've gone through everything for

1       today.  Everybody understands what they need to do.  The

2       defendant's objections are denied at this stage without

3       prejudice for the parties to meet and confer, try to narrow

4       the issues in a way that the court can understand what the

5       objection is, and if you can group them together in some way,

6       if there's common objections, that would be helpful.

7              MS. NAPORA:  We will do that.  We have some other

8       housekeeping issues.  Is now the time to raise them?

9              THE COURT:  Yes.  I have another hearing.

10             MS. NAPORA:  I'm sorry.  I'll talk very quickly.

11             MR. STALLINGS:  Can we stay on the issue of the meet

12      and confer so we know the logistics of that issue?  First we

13      would ask, rather than denying without prejudice, that you

14      simply withhold ruling on the objections until we meet and

15      confer and set a deadline.

16             THE COURT:  I'm not going -- you are going to have to

17      renew them, because I need to better understand what your

18      objections are.  It was too cryptic for the court to be able

19      to assess them.  You know, for good or bad, for the most part,

20      the relator, in filing their objections, I could understand

21      them, for the most part.

22             MR. STALLINGS:  We apologize.  We'll meet and confer,

23      but timing wise, we'll be very aggressive in meeting and

24      conferring.

25             THE COURT:  That's what you need to do.  We can take

1    them on a rolling basis too.  Prioritize.  Find out which ones

2    you are going to be using first up, what the witnesses are.  I

3    think that's helpful to get the order of the witnesses and to

4    identify what exhibits are going to be used with what

5    witnesses.  Start with those and start going on.

6              If we have to stay a half hour at the end of every

7    day, try to start a half hour early every day, we will do that

8    and try to get through this.

9         MS. NAPORA:  Just a couple of things.  I'll try to

10   streamline.  The court's order suggests that we need to get

11   your approval for any visuals we might use in opening.

12        THE COURT:  You need to show them to the other side,

13   and if there's an objection, then I rule on the objection.

14        MS. NAPORA:  So we will provide those tomorrow.

15        THE COURT:  You've got to do it enough in advance

16   that somebody can object, and it goes both ways.  If your

17   openings are going to rely on any visuals, that's fine.  If

18   you want to rely on an exhibit that's been admitted or not

19   objected to, I don't have a problem with that, but if you're

20   creating something to show to the jurors, I don't know what it

21   would be, but if you are creating something, you need to show

22   it to the other side because if there's a prejudicial aspect

23   to it, I need to rule on it in advance.

24        MR. STALLINGS:  Understood.

25        THE COURT:  Exchange those tomorrow.

1      MS. NAPORA:  We did have a question in terms of

2  security and access to the courtroom for our trial consultant.

3      THE COURT:  I'm not that familiar with that courtroom

4  up there.  If it were here, I could tell you where you could

5  store your things.  We might be able to give you a room to

6  keep things in overnight or lock the courtroom at the end of

7  the day so you can keep things in the courtroom.  I can tell

8  you I don't intend to have hearings -- other hearings in the

9  courtroom, so if you are comfortable leaving them in the

10  courtroom overnight while we're there, that's fine with me.

11  We'll make sure that the doors are locked.

12      MR. MORGAN:  Very briefly, judge, there's two tables

13  for the defendants in that courtroom.

14      THE COURT:  We're going to try to get another table

15  in there.  I'm not that familiar with it but we'll try to make

16  that happen.

17      MR. MORGAN:  Would it be smart of us to buy a folding

18  table in case --

19      THE COURT:  Let me just check.  I don't have an

20  answer for you at this stage.  I know we requested it.  I

21  don't know if it can be accommodated.

22      MR. MORGAN:  As long as there's not an objection on

23  the part of the court, we'll see the lay of the land and ask

24  to be able to get a table and bring it in.

25      THE COURT:  If we don't have one, you can bring it

1    in.  We're trying to get you two tables so it can be like this

2    and everybody could fit at the tables.

3            MR. MORGAN:  I think, for everybody's benefit, to

4    have a sense of the -- you have seated a lot of juries in this

5    district, your expectations for Wednesday, do you think --

6            THE COURT:  You have some open ended questions.  The

7    problem is once you have to question everybody -- what I do,

8    so you know, we go through and the questions are designed to

9    get a yes or no answer.  Anybody that answers yes is going to

10   be separately voir dired on that question, and for everyone's

11   comfort, what I usually do is go back to the jury room.

12           We call them in in the order in which they answered

13   and go through all of those questions until we have excluded

14   anybody that was excused for cause.  We get the number we need

15   and you come back and you exercise your strikes.

16           MR. MORGAN:  If you seat a jury by early afternoon, I

17   assume --

18           THE COURT:  I'll give the preliminary -- I'll swear

19   them in, give them the preliminary charge and it usually takes

20   about a half hour, 45 minutes to give the preliminary charge,

21   so we have to do that, and then I like to keep your openings

22   together, but if you don't want to do that, if there's time --

23   I don't know.  How long is your opening going to be?

24           MR. MORGAN:  Certainly within the court's limit,

25   within the hour and we hope less.

1            THE COURT:  It counts against your time.  Remember

2     you are going to be on the clock.  You'll have to learn how to

3     use those clocks.  You're each responsible for your own time.

4     We'll set the hours and click down.  Whenever you are on your

5     feet speaking, the clicker comes on.  An objection is counted

6     against the party making the objection.

7            MR. MORGAN:  The world's slowest chess clocks.

8            THE COURT:  They will get counts down.  I only had

9     one time somebody went over.  Most of the time, they have a

10    lot of time left over at the end.

11           MR. MORGAN:  I don't want to belabor this, if it's

12    say mid afternoon, would the court indulge carrying openings,

13    assuming defense is going to present openings, carrying that

14    over to Thursday, or would you expect us to start Wednesday

15    afternoon?

16           THE COURT:  I want to try to make as much use of the

17    time as possible.  This is going to be a long trial.  Once we

18    start down that route, it's so easy and so tempting to do that

19    because everybody is tired, including the judge, from all of

20    the matters going on, and I have other matters that I need to

21    attend to even while I'm up there.  We'll have days off

22    throughout here.

23           We have this Friday we'll be off because of the

24    federal holiday and then the next Wednesday we have to end

25    early anyway.  We don't start Mondays until 1:30 and we're

1    going to be finishing Fridays that we're in session, we finish

2    at 2:00.  I can't be there every Friday because I have a lot

3    of criminal work that I need to attend to here, and the

4    defendants have to appear here, so but you'll have that

5    calendar on Wednesday at least for November and December, but

6    we really -- I also have another problem unless I can get

7    somebody to take a criminal case for me, because we have the

8    Speedy Trial Act.  I may have to do a criminal hearing unless

9    they plead, even in December.  I may have a short time when we

10   can't be together because I have to do that.

11              MR. MORGAN:  Finally, judge, there is one out of town

12   witness, Ms. Irwin, who is on both of our lists.

13              THE COURT:  You can take her out of order.

14              MR. MORGAN:  We would certainly expect to cooperate

15   with counsel.

16              THE COURT:  You both agree with that.  I'm always

17   willing, if you have doctors or whatever, if you need to

18   special calendar people for certain times, we'll break in on

19   one witness who may be testifying, take those people out of

20   order, and I do give a limiting instruction about what it is,

21   and if you have one witness that you would both be calling, I

22   try to give an instruction, you know, that this witness is --

23   the direct exam will be the exam in the plaintiff's case.  The

24   cross-examination will be treated as evidence for the defense

25   case if they would be calling the same witness.

1          MR. MORGAN:  Actually I think we're both calling all

2     the same.  I think all of our witnesses are on their list.

3          THE COURT:  Sometimes you only want the witness to

4     come once.  If the witness is going to come twice, I don't

5     give that because they are entitled to call the witness in

6     their case.

7          MR. MORGAN:  My understanding from the court's

8     standing order, that's our call with respect to the witnesses

9     who we're calling.

10          THE COURT:  Yes.

11          MS. NAPORA:  I just had a quick question about our

12     30(b)(6) witnesses or their 30(b)(6) witnesses.  If the court

13     would like to provide some context to the jury, should that

14     come in through a witness?

15          THE COURT:  What is the 30(b)(6)?

16          MS. NAPORA:  When the witnesses testify on behalf of

17     the company and has been deposed in that way and they'll be

18     sitting on the stand.  It's a hypertechnical legal issue but

19     we weren't sure how the court would like us to approach that.

20          THE COURT:  I can give a limiting instruction that

21     this witness is being called as an officer of the company as

22     well as in their individual capacity, but if you want to meet

23     and confer on that limiting instruction, that would be fine.

24          MR. MORGAN:  We'll propose something, judge.

25          MR. DEVLIN:  Three brief housekeeping matters on

1     behalf of Medicor.  I hope you've noticed we have been trying

2     to not have duplicative filings.

3             THE COURT:  I appreciate that.

4             MR. DEVLIN:  There are some differences between,

5     while we are largely aligned in this case, we are not entirely

6     aligned in this case.  The entire case is based on the fact

7     we're not the same entity.  I want to avoid any problems at

8     trial.  It would be my intention, if there are unique Medicor

9     issues, I may cross-examine.

10            THE COURT:  You can double-team up on the

11    cross-examinations.  You've got to be careful about taking up

12    the juror's time if it's cumulative, but you'll be able to

13    cross-examine any witness you want.

14            MR. DEVLIN:  Thank you, Your Honor.  On that point

15    with time, I know Your Honor has mentioned a clock on a number

16    of occasions.  I believe I know what the starting time is on

17    each clock, but I don't know that I know that.  Will the court

18    be communicating to us at some point prior to openings

19    defendants you got X number of trial hours, plaintiff you got

20    Y number of trial hours?

21            THE COURT:  Yes.

22            MR. DEVLIN:  Finally, with regard to the openings,

23    because there are two parties, and I have no intention of

24    being cumulative, I know your ruling is one hour per side, I

25    was wondering if we could get an hour and 20 minutes.  I don't

1    expect to go more than 15 or 20 minutes in total.

2              THE COURT:  I'll give you 20 minutes.

3              MR. DEVLIN:  I would have no objection to them

4    getting the same amount of time as we get combined.

5              MR. MORGAN:  I don't believe that'll be necessary.

6              THE COURT:  One hour and one hour and 20 minutes.

7              MR. DEVLIN:  Thank you, Your Honor.

8              THE COURT:  It's really because the jurors, they

9    lose -- it's hard for them to just listen to somebody talking

10   to them for that length of a period of time, so it helps to

11   keep it focused.

12             Are there any other issues that you have as a

13   preliminary basis?

14             MR. MORGAN:  Not from the relator, judge.

15             MR. STALLINGS:  Not from the defendant UPMC.

16             MR. DEVLIN:  And none from Medicor.  Thank you, Your

17   Honor.

18             THE COURT:  At this stage, we're going to go off the

19   record.

20        (At 4:25 p.m., the proceedings were adjourned.)

21

22

23

24

25

1

# C E R T I F I C A T E

2            I, BARBARA METZ LEO, RPR, CRR, certify that the
   foregoing is a correct transcript from the record of
3  proceedings in the above-entitled case.

4

5   _\s\ Barbara Metz Leo_            ___11/07/2017___
   BARBARA METZ LEO, RPR, CRR            Date of Certification
6  Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25